SULLIVAN v. BENEFICIAL LIFE INS. CO.

No. 5750. Decided January 4, 1937. (64 P. [2d] 351.)

*H. L. Mulliner* and *H. Hartland Halliday*, both of Salt Lake City, for appellant.

*Bagley, Judd & Ray*, of Salt Lake City, for respondent.

BATES, District Judge.

This is an appeal from a judgment in favor of the defendant in an action brought by plaintiff to recover as beneficiary upon a life insurance policy issued by the defendant upon the life of plaintiff's deceased husband. Judgment in favor of defendant was entered upon a directed verdict.

The complaint alleges the issuance of the policy on the 6th of November, 1920, in the amount of $5,000, the death of the insured on the 18th of December, 1933, while the policy was in force and effect, and prays for judgment.

The answer admits the execution of the policy; that plaintiff is the beneficiary; the death of the insured. It alleges the lapsation of the policy by reason of the failure to pay the quarterly payment October 6, 1932. It is further alleged by the defendant that about December 24, 1932, reinstatement applications were delivered to deceased; that he tendered payment of premium and interest on condition that

the policy should be reinstated if his application were approved; that the policy provided it might be reinstated upon payment of arrears and furnishing evidence of insurability satisfactory to the company; that the defendant declined in good faith to reinstate.

The plaintiff, in her reply, denies that there are any provisions of the policy preventing a waiver of strict performance by the company, and denies that any application forms were given or any understanding had as to application for reinstatement on December 24, 1932, when the premium was paid, and denies that the defendant, acting in good faith or at all, denied reinstatement. It is then alleged in the reply that the policy had been in effect twelve years, the thirteenth year commencing October 6, 1932, and that during the period of grace defendant extended credit thereon and extended time for the payment of the premium and agreed that the policy would not be forfeited in accordance with the provisions thereof if the premiums were not paid; that the company did accept the money thereafter, and that the blank forms for reinstatement were given simply with the statement that if the money did not arrive for "quite some time" the insured might sign and file the application and everything would be all right; that the premium was paid December 24, 1932, and accepted by the company including all due premiums and interest; that afterwards the insured returned with the blanks, and that in tendering the January payment the blanks were asked for and delivered, and thereafter the payment for the quarter commencing in January was refused; that plaintiff was informed there was nothing wrong with the application for reinstatement, but that the company had reasons for refusal, but refused to disclose them; that the defendant by its conduct waived strict performance and right of forfeiture of the policy, extended credit, and was by its conduct, and is, estopped from claiming a forfeiture.

At the conclusion of the evidence, the defendant moved for, and was granted, a directed verdict.

The plaintiff contends the court erred in granting a directed verdict for the following reasons:

1. That no motion for a directed verdict was filed; that there is no stipulation waiving this or consenting to an oral motion; and that the oral motion is insufficient.

2. That the policy did not lapse. And

3. That if the policy did lapse it was reinstated.

The question of the sufficiency of the motion can best be considered by examining that part of the record as made, which the defendant claims is sufficient:

"Mr. Bagley: (Counsel for defendant) Comes now the defendant, Beneficial Life Insurance Company, now that all of the evidence is in and both sides having announced that they rest, and moves the court to instruct the jury to return a verdict in favor of the defendant and against the plaintiff: no cause of action, on the following grounds and for the following reasons:

"At the outset, in discussing the evidence in support of this motion, I will advert to the uncontradicted evidence, with this possible exception, that in the testimony of the plaintiff where there is a conflict I will refer to both lines of testimony given, and then I will rely upon that principle that a conflict in evidence cannot be created by conflicting statements in the plaintiff's testimony alone.   *   *   *

"The evidence affirmatively shows—and there is no evidence to the contrary—that the policy on the life of the insured, sued on in this action, was issued on October 6, 1920; that it was provided in that policy that each payment of premium continued the policy in existence only for and during the period covered by the premium plus a thirty-day period of grace; that it appears in this case that the plaintiff had exhausted all reserve and loan value on this policy prior to the due date of the October 6, 1932 premium;

"That it appears that the premium due on October 6, 1932, was not then paid on that due date, and it also appears that it was not paid November 6th, within the thirty-one-day period of grace, and that it was not tendered within another full grace period of thirty-one days, nor within a grace period of one and one-half times the regular grace period, nor until December 24, 1932.

"In presenting this motion it will be necessary not only to urge the facts and the law as I conceive it in support of the defendant's theory, but to support, anticipate and meet the theory of the plaintiff. And I will address myself as I go along to the case which your Honor has to pass on, and what the defendant affirmatively has shown on its defense, as well as the state of evidence on the defenses, I may call them, urged by the plaintiff.

"First, that there was a waiver—so the plaintiff contends—of the provision requiring payment of premium.

"Second, that the defendant was and is estopped from claiming failure to comply with the provisions of the policy.

"Beginning at the beginning, now, we find that the policy contains the following material provisions, material to this case and this motion:

"Mr. Mulliner (Counsel for plaintiff) : Are you reading from some numbered part?

"Mr. Bagley:   Under Privileges and Conditions 1. Payment of premiums being the top.    *   *   *

"Prior to the luncheon recess adjournment, I had reached the point in my presentation of the alleged waiver of conditions precedent fixed in the policy and of estoppel and had discussed the former at considerable length and latter at some length.    *   *   *

"The Court:   There has been a considerable and a very learned discussion on the problems involved in this case and the court has been troubled with some duties relative to some features of the case but believes it has its feet on the ground and is ready to bring the case to a close.

"The evidence in this case—and I am not going to discuss the evidence very much—but before October the 15th, 1932, and during the period of grace, Mrs. Sullivan received a notice from the company relative to the lapsing of her husband's policy in which she was the beneficiary, and she also had a letter speaking of the same thing.

"And on October the 15th she went to Ross Ralph's window at the Beneficial Life and her words were, 'I asked Mr. Ralphs what I should do in case the money was late in getting here.'

"And the answer came, 'When Mr. Sullivan sends you the money you bring it in.' And then there was added a rather significant statement, 'That is all that will be necessary.'

"Then Mrs. Sullivan said, 'The money not having arrived, I again went to the office.'

"Now, that was the latter part of October or first of November, she said.

"She said, 'Mr. Ralphs, this money might not get here until after the grace period has expired. Will it be all right to bring it in after the grace period has expired?'

"That indicates clearly to the court's mind that she had no understanding up to that time that she was to have such time as might be necessary or convenient or that there was any understanding between them that the payment might be deferred beyond the period of grace.

"The answer came, 'Yes, it will be all right. You bring it in.' This was six or seven days before the grace period expired. Then the statement followed, 'In case the money does not arrive for quite some time, you take this yellow form, the reinstatement application,—she said that is what he called it—and send it to Mr. Sullivan and have him fill it out.'

"In the court's mind there can't be any question about what she had in her mind or what she understood from him. And she took the statement which had been designated as a reinstatement application, and sent it to Mr. Sullivan.

"Then on her redirect examination she said that she referred to it at that time as a reinstatement sheet or application.

"Then she went back on December the 24th and she asked again if there was anything wrong with the reinstatement of the application, and she referred to it also as the yellow form. And then there was more or less discussion about that.

"Now, the court has reflected upon this case as carefully as it has the ability to do, and is clearly of the opinion that the motion for a directed verdict ought to be granted. And in the court's view that makes it unnecessary to consider the other motion which was made and which the court indicated it would grant, relative to certain evidence. So the clerk will prepare a verdict of 'No cause of action.'
*  *  *

"Mr. Mulliner: May the record show our exception to the granting of the motion and to the directing of the verdict?

"The Court: Yes."

Whether it is necessary that a directed verdict be in writing, we need not consider at this time. It is enough for us to consider the record as made upon the theory that an oral, informal motion is sufficient, if it otherwise complies with the requirements of the law as heretofore announced by this court.

In *Owens* v. *San Pedro, L. A. & S. L. R. Co.*, 32 Utah 208, 89 P. 825, 827, Ritchie, District Judge, in writing the opinion of the court said:

"We see no reason for extending the rule requiring that a motion for a nonsuit should be based upon specific reasons to include a motion to direct a verdict. A trial court, when asked to direct a verdict, may require the moving party to state his reasons if the circumstances of the particular case require it; but there is no merit in the proposition that the court should be required to specify its reasons for directing a verdict."

The question came up for consideration, again, in *Smalley* v. *Rio Grande W. R. Co.*, 34 Utah 423, 98 P. 311, 317. In that case Justice Straup, the writer of the opinion, in commenting upon the language used by Judge Ritchie in the Owens Case, said:

"If by these expressions it was intended to hold that a specification of grounds upon which the direction of a verdict is based need not be made in any case, we disapprove the holding. To be in harmony with the prior decisions of this court requires a holding that a sufficient specification of grounds must be made, either in the motion or by the court in directing the verdict, to indicate the question of law that takes the case from the jury."

In the Smalley Case, Justice Straup, after quoting the following from *Palmer* v. *Marysville Dem. Pub. Co.*, 90 Cal. 168, 27 P. 21:

"It is error for the trial court to grant a nonsuit, unless the grounds therefor are called to the attention of the trial judge and the plaintiff at the time the motion is made; and, where none of the grounds upon which the nonsuit is asked are sufficient to warrant the court in granting the motion, the order granting it will be reversed, although another ground, not specified in the motion, might have warranted the order,"

further said:

"We think the reasons given by courts, requiring the grounds upon which a motion for nonsuit is based to be specified, in order that the court may know upon what question of law the case is asked to be taken from the jury, and the party against whom the motion is

directed may be afforded opportunity to correct the defects, if they admit of correction, and can be obviated by additional evidence, apply with equal force to a motion for a direction of a verdict. If such opportunity should be afforded him on a motion for nonsuit * * * for much stronger reasons should such opportunity be given him on a motion for a direction of a verdict, which, if granted, would be a bar to another action."

It is further pointed out in that case that the rule is qualified to the extent that:

"* * * If it is otherwise made manifest upon what question of law the case was taken from the jury, and the defects upon which it was based do not admit of correction, or could not have been cured had direct attention been called thereto, a failure to specify grounds will not reverse the ruling."

In *Christensen* v. *Utah Rapid Transit Co.*, 83 Utah 231, 27 P. (2d) 468, the question was again before this court for consideration, and the rule was applied. No grounds for the motion for a directed verdict were stated by the defendant in making the motion, but the court, in ruling on the motion, clearly indicated that it was based upon the ground that the plaintiff, himself, was guilty of negligence and could not recover.

It thus appears that in the Smalley and in the Christensen Cases this court definitely recognized and committed itself to the doctrine that either in the making of a motion for a directed verdict by a defendant, or in the ruling thereon by the court, it must appear what the rule of law is that the order is based on. As pointed out in the Christensen Case, a mere general statement that under the evidence the plaintiff is not entitled to recover or that the defendant is entitled to a verdict, or that the plaintiff has not made a case sufficient to go to the jury, does not point to anything.

We are unable to say that the record in this case makes it possible to determine the rule of law upon which the court based its order directing a verdict. All that counsel

for the defendant claims for the record is that it establishes that respondent's motion was based upon the failure of appellant to prove by competent evidence that the policy on which she sued was in force on December 8, 1932, when the named insured died. That amounts to nothing more than an assertion that there is no evidence to justify a verdict in favor of the plaintiff, or that the plaintiff has not proved its case. Here is a case where the issues show a dispute as to whether or not the policy lapsed for failure to pay the premium which became due October 6, 1932; and where there is an issue as to whether or not there was a reinstatement of the policy; where there is an issue as to whether or not the defendant waived the provisions of the policy for the prompt payment of premiums; where there is an issue as to whether or not the defendant is estopped to deny a waiver; where there is an issue as to whether or not payment of the October payment was received on the 24th day of December, unconditionally; where there is an issue as to whether or not the insured applied for reinstatement. All these things and others raise questions of law which were necessarily included in the order directing the verdict, upon any one or more of which the court might have based his judgment, and all of which might well have been within the rule of the law announced by the respondents in their brief that the appellant failed to prove the policy was in force December 8, 1933. That, we think, is insufficient.

If such should be the holding of this court, then, in practical effect would the rule requiring the specification of grounds for directing a verdict be destroyed. Good practice and fairness to a litigant demand that if cases are to be taken from the jury the defects in the evidence be more particularly pointed out than was done in this case. But even though the motion was insufficient, if the record is such that a verdict in favor of the defendant must be rendered in any event, we might be justified in saying that the error is harmless. We must therefore examine

the record further to determine whether or not any other verdict may have been arrived at by the jury.

It is a general principle of law that where a direction of a verdict is involved, if there is any substantial evidence to justify a verdict in favor of the plaintiff, ■ the motion should be denied.

A policy for $5,000 was issued upon the life of the insured on the 6th of October, 1920, and he thereafter made the annual payments until October of 1931; the policy provided for quarterly payments, which the insured made for the year 1932 excepting the quarterly payment which became due October 6, 1932. The policy contained the following provisions:

"1. Payment of Premiums. All premiums under this policy are payable in advance either at the home office or to any authorized agent upon the delivery of a receipt signed by the President, Vice President or Secretary and countersigned by an agent of the company, and may be paid either annually, semi-annually or quarterly, according to the rates stated on the fourth page hereof. And premiums so paid shall not maintain this policy in force beyond the date when the next premium is payable, except as provided hereinafter. * * *

"2. Grace. A grace of Thirty-one days (without interest) will be granted for the payment of every premium after the first, during which time this policy shall remain in full force and effect. If, however, the insured shall die within said period of grace, the unpaid balance of the premium or premiums for the current policy year will be deducted in any settlement.

"3. General. 1. No alteration of this policy or waiver of any of its conditions shall be valid unless made in writing and signed by an officer of the Company * * *

"4. In the event of default in premium payments, unless the cash value has been duly paid, it is agreed that this policy may be reinstated at any time upon evidence of insurability satisfactory to the Company, and the payment of all overdue premiums and the payment or reinstatement of any other indebtedness to the Company upon said policy, with interest at the rate of not exceeding five per cent per annum."

A few days prior to October 6, 1932, a notice was sent to the insured and received by the respondent of the due date of the premium. The body of the notice reads:

"Beneficial Life Insurance Co. of Salt Lake City, Utah

"Hereby gives notice that in accordance with the terms of the policy the undermentioned premium will become due and payable as stated below. Said premium must be paid at the Home Office of the Company, Vermont Building, Salt Lake City, Utah. If premium is paid after 31 days from the due date an interest charge will be made for over-due time and the Company assumes no liability under the policy except as provided therein until official receipt is issued by the Company and signed by the Secretary.   *   *   *

"Unless premium is paid as above your policy will become null and void except as to any provisions otherwise provided therein.   *   *   *

"Only an executive officer has power in behalf of the Company to make or modify any contract of insurance, or to extend the time for paying any premium, and the Company shall not be bound by any promise or representation heretofore, or hereafter made, unless made in writing by one of the said officers   *   *   *

"The Company will receive premium within 31 days from its due date. The acceptance of any premium by the Company, after the expiration of the said 31 days, is not to be construed as a waiver of the conditions of the policy as to future payments, or as establishing a course of dealing between the Company and the holder of the policy."

Plaintiff testified that she called at the home office of the defendant company about the 15th of October, 1932, after receiving a notice from them; that she talked there with Ross Ralphs, the cashier; that she asked Mr. Ralphs what she should do in case the money was late in getting there, to which Mr. Ralphs replied: "When Mr. Sullivan sends you the money, you bring it in. That is all that will be necessary." That she returned again to the office in the latter part of October or the first of November and said: "Mr. Ralphs, this money might not get here until after the grace period has expired. Will it be all right to bring it in after the grace period has expired?" And he said: "It will be all right. Bring it in. In case the money does not arrive for quite some time, you take this yellow sheet and send it to Mr. Sullivan and have him fill it out." That no further or other notices were received than as heretofore indicated; that on the 24th of December, she again called at the main

office of the company in Salt Lake and there gave them a check for $100.06 and received a receipt which showed the number of the policy, the premium, due date October 6, 1932, the quarterly payment $54.13, interest for renewal of loan or note $26.38, double indemnity $2.65, premium interest $.90; cash, basis, annual, semi, quarterly $54.13, amount paid $84.06, $16 cash; that at the bottom of the receipt there was the following printed statement:

"Premium payments made, except in exchange for a home office receipt signed by the secretary and countersigned by the company's authorized representative, is not valid. Any premium payment made after the period of grace is subject to evidence of good health satisfactory to the company, except as provided in the policy."

That she again returned to the office of the company, December 27 or 28, and tendered to Mr. Ralphs, the cashier, $84.06 representing the premium and interest which would accrue January 6, 1933; that when she handed this January payment to the cashier, he asked her for the receipt for the previous payment and that she handed it to Mr. Ralphs; that when he got the papers from her, he then told her he could not accept the money; that she asked him why not, and he replied: "I am not in a position to explain." That he then left with the receipt and was gone about 15 minutes; that when the receipt for the first payment was first given her December 24th, it did not contain the following notation, "Subj. to app. H. F.," but when it was returned to her after she had given it to Mr. Ralphs when she offered to make the second payment on the 27th or 28th, it then bore that notation in another colored pencil.

The yellow form referred to in the foregoing testimony is an application for reinstatement of policies, which was handed to the plaintiff at the time she talked with Mr. Ralphs the second time with reference to bringing the money in if it was late arriving.

In determining whether or not the foregoing evidence, as given by the plaintiff, establishes a waiver on the part of

the defendant of their right to prompt payment and lapsation, it is urged that the following further examination of the plaintiff in cross and redirect examination so modifies and destroys the effect of her testimony as to justify the court in giving it no weight and in determining the effect of her testimony exclusively upon the answers given by her in cross-examination:

"Q. And on that occasion what did you say to him? A. Well, I asked him what I should do in case the money was late in getting in here. I had about six or seven days before this grace period would expire, and so, the money not having arrived, I again went to the office, and I asked Mr. Ralphs if it would be all right to bring the money in after the grace period had expired, and he said, 'Bring it in, it will be all right.'

"Q. Did he say anything then—on your second visit—about the Company having forms that took care of that? A. Yes, he did.

"Q. And did he give you the forms at that time? A. Yes sir.

"Q. With instructions to send them to Mr. Sullivan to be executed by him? A. Yes sir.

"Q. And you took those forms away with you? A. Yes sir.

"Q. And you mailed them to Mr. Sullivan? A. Yes sir. * * *

"Q. Now, Mr. Bagley, in his examination, asked you with reference to these forms, these yellow forms that were referred to? A. Yes sir.

"Q. He referred to them, and I referred to them. You said you got those from Mr. Ralphs, in your conversation with him at the end of October or the first of November, as I understood you; is that correct? A. Yes sir.

"Q. At that time, just what did he say with reference to those forms? A. He said to take them and send them to Mr. Sullivan; have him fill them out.

"Q. Under what circumstances, if he mentioned any circumstances? A. He did not mention any circumstances. He said: 'Just take those forms and send them to Mr. Sullivan, and have him fill them out, and return them to this office.'

"Q. What was said before that? A. I asked Mr. Ralphs, I said, 'I might not get this money until after the grace period has expired.' I said, 'Will it be all right to bring it in after the grace period has expired?' He said, 'Yes, bring it in.'

"Q. Now, when he handed you the forms did he say anything further about time? A. Yes, he said: 'If this money doesn't arrive for

quite some time you take this yellow form along and send it to Mr. Sullivan for him to fill out.'

"Q. Was that all he said in relation to those forms? A. Yes.

"Q. Counsel asked you if at that time he said they had forms to take care of that. Did he use that language? A. No, he did not.

"Q. Do you recall that he said anything further about those forms than what you have testified to here? A. No sir.

\* \* \* \*

"Q. Now, you say that there was no such statement made to you as I embodied in my question that when you asked about what you should do with the money if it came in after the grace period, that the Company had forms, is that true? A. No, Mr. Ralphs asked me to bring the money in when it arrived, and I asked him if it would be all right to bring it in after the grace period expired, and he said, 'Yes, bring it in, it will be all right.'

"Q. Then I asked you on cross-examination, did I not, if he did not say right then and in that connection to you: 'The Company has forms to take care of the situation?' A. Yes, he said, 'In case the money does not arrive for quite some time you take this yellow form along, send it to Mr. Sullivan and have him fill it out.'

"Q. Let us go back. I am trying to ask you if you did not say just what I am asking when you made that statement, and asked Mr. Ralphs what you should do if the money should not come in until after the grace period, and he said, 'Bring it in.' Now, did he not, in that conversation then say to you: 'The Company has forms to take care of that situation?' A. He said, 'You take this form along.'

"Q. Just answer that question 'Yes' or 'No.' A. Yes.

"Q. Then you did not mean it when you said to Mr. Mulliner that nothing was said in that conversation about the Company having forms, did you? A. No.

\* \* \* \*

"Q. Just one point here, Mrs. Sullivan, that I would like to have you clear up for us, that is with relation to your conversation in October, I think you fixed it about the 15th of October, with Mr. Ralphs, I asked you on your direct what was said at that time, and you gave what was said by Mr. Ralphs. Now, yesterday Mr. Bagley asked you this question: 'Did he say: "We have forms to take care of that." ' and your answer was, 'Yes' Did you understand the question? A. No, I did not understand that last question.

"Q. He did have forms there? A. Yes.

"Q. What did he say? A. He said that when the money came in, to bring it in, and it would be all right, if it came in after the grace period had expired.

"Q. What I am getting at is what did he say, if anything, with reference to these forms that were mentioned? A. He did not say anything in regard to the forms.

"Q. Do you mean by that, he just handed you the forms? A. Yes, he just handed me the forms, and he said that if the money did not arrive for quite some time then I could send them to Mr. Sullivan.

"Q. Was that all he said? A. That was all he said.

"Q. Were you in error yesterday, then when you answered 'Yes' to Mr. Bagley's question that he said they had forms to take care of that? A. I was. I did not understand that.

* * * *

"Q. What was that conversation with Mr. Ralphs? A. I asked him what I should do in case I was late in getting the money in here, and he said, 'You just bring the money in when it comes,' and he said that the Company furnished forms, and if I wanted those I could accept them and send them to Mr. Sullivan and have him fill them out and bring them in."

Witness was evasive. She replied:

"A. Well, I probably did not understand it that way at the time. You must bear in mind, Mr. Bagley, I did not have time to go through my papers. That was of long standing.

"Q. Then you did so answer? A. Yes.

"Q. And that was true, wasn't it? A. As well as I understood it at that time. I said I had not checked upon my papers.

"Q. There was not anything upon your papers that would refresh your recollection as to what Mr. Ralphs had said, was there? A. No.

"Q. So that you did not refresh your recollection from your papers with reference to that statement having been made, did you? Answer please. A. No.

"Q. You would say then you did not get any other forms? A. Yes sir.

"Q. You were so asked and you so answered? A. That was a mistake, though, at the time.

"Q. What other forms did you mean? A. I did not receive any.

"Q. You were trying to tell the truth? A. I was trying to tell the truth to the best of my knowledge at that time.

"Q. And are those statements true? A. Yes."

But, we are unable to accept that view. The court is not justified in determining whether a directed verdict should be granted to determine the weight of plaintiff's evidence solely upon selected parts of her evidence found in cross-examination or elsewhere. ■

Respondent has cited *Fowler* v. *Pleasant Valley Coal Co.,* 16 Utah 348, 52 P. 594, 596. In that case the question to be determined was whether or not the plaintiff relied upon his own information or upon the information of the defendant company with reference to the dangers of the place in which plaintiff was working. Plaintiff testified, generally, that he relied on the statement of the foreman that the place was safe. The record further shows that he told the foreman that it was liable to slip, and that he thought the coal would fall, that it was not safe for him or any other man, that he continued to believe so and thought it should be taken down, that knowing this dangerous condition, he voluntarily sat down under the projecting coal, and while he was sitting there his attention was called to the coal and he was asked why he did not take it down. While sitting there the coal fell on him. The court says:

"He voluntarily assumed, for his own convenience and comfort, the responsibility of selecting that place in which to sit and smoke. He voluntarily assumed the risk of injury that he invited by his own negligent acts and want of reasonable care. * * * He voluntarily sat down under the coal, and thereby exposed himself to the known danger, while enjoying his leisure. It cannot be said he was not thinking of the coal at the time he sat there, for the testimony he offers shows that he must have thought of the coal, because he discussed the propriety of taking it down while he sat under it * * * If there be a contradiction, it arises from the plaintiff's own testimony. In such a case, where a nonsuit is asked, the trial court may consider such testimony true as bears the most strongly against the interest of the plaintiff."

It is clearly a case where the ruling of the court is based on definite and repeated testimony of the plaintiff that he had full knowledge of all the dangers, and thereby makes the

statement that he relied upon the statement of the foreman wholly improbable and entirely unworthy of belief.

In *Putnam* v. *Industrial Commission*, 80 Utah 187, 14 P. (2d) 973, 981, this court says:

"In considering the testimony of the applicant on the issue as to whose employ he was in, we must look, not alone to the answers made by him to leading questions, or on assumptions that he was in the employ of Putnam, but to the whole of the testimony bearing on the subject. As to that, the familiar rule is applicable that testimony of a witness on his direct examination is no stronger than as modified or left by his further examination or by his cross-examination. A particular part of his testimony may not be singled out to the exclusion of other parts of equal importance bearing on the subject."

In Corpus Juris the rule is again stated:

"To determine whether the evidence makes an issue of fact, the whole of the evidence and not merely certain selected parts thereof is to be considered."

An examination of the evidence under cross-examination upon which respondents rely for destroying the evidence given on direct examination is not of the character found in the Fowler Case. It cannot be said that there are such positive and clear-cut contradictory statements in the cross-examination as to make the evidence given in the examination in chief wholly incredible. Under such conditions, the rule announced by Justice Straup in the Putnam Case that all the evidence be considered, and portions thereof may not be selected or omitted for the purpose of basing a judgment. Such consideration can be given only by the trier of fact.

The writer was at first inclined to the view that because of the following positive provisions in the ■ contract of insurance:

"a. Any premium so paid shall not maintain the policy in force beyond the date when the next premium is payable, except as provided hereinafter * * *

"b. No alteration of this policy or waiver of any of its conditions shall be valid unless made in writing and signed by an officer. * * *

"c." And because of the language of the notice, "only an executive officer has power in behalf of the company to make or modify any contract of insurance or to extend the time for paying any premium, and the company shall not be bound by any promise or representation heretofore, or hereafter made, unless made in writing by one of the officers. * * * The acceptance of any premium by the company after the expiration of the said 31 days is not to be construed as a waiver of, the conditions of the policy as to future payments or as establishing a course of dealing between the Company and the holder of the policy.

"d." And of the printed provision in the receipt. "Any premium payment made after the period of grace, is subject to evidence of good health satisfactory to the company, except as provided in the policy."

—plaintiff ought not be permitted to prove a waiver or an estoppel in parol, but the authorities are clearly to the effect that because these provisions are all for the benefit of the insurer in insurance contract, they may all be waived.

In *Ellerbeck* v. *Continental Casualty Co.*, 63 Utah 530, 227 P. 805, 807, this court says:

"That a general agent, such as the Continental Agency Company mentioned in this record, has authority to waive payment on the dates stipulated in the policy and to extend credit for the payment of premiums due, *regardless of any provision written in the policy to the contrary*, has been determined by this court in *Loftis* v. *Mutual Ins. Co.*, 38 Utah 532, 114 P. 134." (Italics supplied.)

It is apparent from an examination of the Loftis Case that the question of waiver was given full and careful attention. The case has frequently been referred to since and must be recognized as an expression of the law of this State. In that case, the policy under consideration contained the following provisions:

"No alteration or waiver of the conditions or provisions of this policy or said application shall be valid unless made in writing at the

company's home office, and signed by the president or vice president and also secretary or assistant secretary; nor shall notice to or knowledge of any person of anything not written in said application be held to effect a waiver or estoppel upon the company or affect the provisions of this contract.

"Failure on part of the insured or any one claiming under this policy to comply with any of the foreging agreements will render this policy void."

In the application made by the insured for the insurance, the following language is used:

"I understand that no alteration or waiver of the conditions or provisions of any policy is valid unless made in writing at the company's home office and signed by the president or vice president and also secretary or assistant secretary, and that no notice to or knowledge of any agent or any other person of anything not written in this application is to be held to effect a waiver or estoppel upon the company or affect the provisions of any policy."

Affirming the judgment in favor of plaintiff, the court says:

"While it is true that the contract of insurance in this case provided that, in case any installment of the premium was not paid when due, all rights under the policy lapsed or the policy ceased to be effective, yet such a provision was for the benefit of appellant, and it had the undoubted right to treat the policy as in force, although cause for forfeiture existed. That insurance companies may waive prompt payment of policies, although such payment is of the essence of the contract of insurance and may continue and treat policies in force after all rights thereunder had lapsed by reason of a provision therein that nonpayment of the premium or any part thereof shall cause the policy to become void and of no force or effect, is too well settled to admit of dispute. The very authorities cited by appellant's counsel not only recognize the doctrine, but they enforce it."

Quoting from Joyce on Insurance:

"As a general rule, if the company has treated the policy as valid, and has sought to enforce payment of the premium, or has otherwise with knowledge recognized, by its own acts or declarations, or those

of its agents, the policy as still subsisting, it waives thereby prior forfeitures."

Quoting from Cyc:

"Where, subsequent to the accrual of a forfeiture, under the conditions of a life policy, for nonpayment of premiums, the insurer, with knowledge of the facts, by its own acts or those of its agents recognizes the contract as still subsisting, and manifests an intent not to take advantage of the forfeiture, the court will be justified in finding a waiver of the forfeiture. In such cases the liability of the insurer accrues on the death of the insured, and it is too late afterwards to claim for the first time the benefit of a forfeiture.

If an attempt to collect a premium after forfeiture constitutes a recognition of the contract as being in force, certainly actual payment of past-due premiums, and ■ receipt thereof by the insurer without conditions attached, must be given the same effect.

It is urged by counsel for the respondent in argument that unless facts claimed to waive a forfeiture have in them all the elements of an estoppel in pais, it cannot ■ amount to a waiver. That question is fully answered by this court adverse to respondent's contention in the Loftis Case:

"Moreover, that the waiver must amount to an estoppel in pais. That is, if there be no estoppel, there is no waiver. While some cases go to the extent of holding that unless the facts also constitute an estoppel in pais there is no waiver, in our judgment both reason and the weight of authority is against this view. * * * No doubt a waiver operates as an estoppel upon the party who waives; but it is not essential to a waiver that a party in whose favor it is made must prove all the elements of an estoppel in pais before he is entitled to avail himself of the waiver. A party to a contract who has the right to terminate it by reason of some default by the other party may, nevertheless, waive such a right, and, if he does so, the contract remains in full force and effect. * * * Where a waiver prevents a forfeiture, the law ordinarily permits a liberal construction to be placed on the acts of the party waiving with the view of bringing about a waiver of such a forfeiture. * * * 'It is unreasonable to

argue that the assured could be a member for the purpose of making contributions to others, but not a member when advantage to him or his beneficiary accrued—a member not to receive, but to give only.' * * * 'To allow the company to treat the policy as valid after the right to forfeit it has accrued, and insist on the note being paid as long as it deems this to its interest, and then, when it learns that the assured is sick or dead, to rely on the past forfeiture, which, at the time, it elected to waive, would be to allow it to take inconsistent positions'—so may it also be said in this case."

If we accept as true plaintiff's version of what happened —that during the early days of grace period, she called at the office of the company and there inquired what she should do in case the money was late getting there and was told: "When Mr. Sullivan sends the money, bring it in. That is all that will be necessary." That again during the latter days of the grace period she again called at the window and inquired: "Will it be all right to bring it in after the grace period has expired?" And was again told: "It will be all right. Bring it in." And then, in addition, in that conversation was told, "In case the money does not arrive for 'quite some time,' take the yellow form (the application for reinstatement) and have Mr. Sullivan fill it out and bring it in." And if, thereafter, without any notice of forfeiture or lapsation, she called at the home office of the company and there paid the past due premium and the money was received without condition attached—it is hard to conceive of a more definite course of conduct tending to mislead. If such state of facts do not constitute a waiver, then there can be no waiver by conduct or otherwise except it be in writing. That is not the doctrine of the Loftis Case. Neither is it what the authorities generally teach.

It is frequently stated in the books that a party should not be charged with a waiver of forfeiture in the absence of a knowledge of the conditions existing. That requirement is fully complied with if we accept as true the version of the plaintiff as heretofore outlined when she inquired during the grace period and was told to bring

the money in after grace and that was all that would be necessary. It was the right of the insured to make payment and maintain the insurance contract, no matter what the conditions. The only question involved at that time was the question of payment. There was no question of insurability involved. The company knew of the default when they received the money pursuant to their representations made during the grace period.

In *Ballard* v. *Beneficial Life Ins. Co.*, 82 Utah 1, 21 P. (2d) 847, 851, judgment in favor of the plaintiff, beneficiary of an insurance policy, was reversed. The question of waiver and receipt of payment was involved, and the principles of law herein referred to are again affirmed:

"That compliance with provisions of an insurance policy may be waived, and that one party as against the other because of acts and conduct may be estopped from asserting a forfeiture in the same manner that waivers or estoppels may be asserted with respect to provisions of other contracts, is well recognized by judicial authority."

Quoting from Cooley's briefs on Insurance, the court further said:

"\* \* \* is the rule that where there has been a default in the payment of a premium or an assessment justifying a forfeiture of the contract, such forfeiture is waived if, with knowledge of all the facts, the insurer, either before or after the death of the insured, unconditionally accepts and retains the specific premium or assessment for which the insured was delinquent."

In this case, if the testimony of plaintiff is accepted, there was an unconditional receipt of the money. True, within the course of a day or two the money was by the company, unknown to the insured or the beneficiary, set up in a suspense account, and when the plaintiff again called at the office on the 27th or 28th of December, they then indicated to her that they did not recognize the policy and later returned her the money, still the fact remains that at the time

the money was paid, under her evidence. it was received entirely without condition.

Quoting further from the Ballard Case:

"When payment of premium was tendered after the period of grace had expired, the insurer need not accept it, but when accepted *it must bring home to the insured any conditions it desires to impose*, as the insurer cannot accept money of the insured, retain and use it, and at the same time deny payment was made and repudiate liability under the policy, that the insurer should wait to accept money until conditions are communicated to the insured and complied with by him, * * * and that where payment of premium was tendered unconditionally by the insured on a policy that had lapsed for nonpayment of premium, the insurer accepting payment of premium without inquiry as to insured's health would not defeat a liability on the policy, even though it were shown the insured was seriously sick at the time of the tender."

It is urged by respondent that the insured in the yellow form—application for reinstatement—which was presented to the company on the 27th or 28th of December, admits the policy had lapsed, and that therefore the question of waiver must be conclusively ruled against plaintiff. We think not. To so hold would be in effect to say that an insured person under similar conditions must abandon his rights under a waiver or abandon his right to reinstatement. No authorities are cited in support of the doctrine and we have seen none. Neither is there any merit in the claim of the defendant that when the $84.06 paid by plaintiff and accepted by the defendant for the October 5th premium payment was returned by check by the defendant to the plaintiff, it constituted an accord and satisfaction. Counsel for defendant, in its brief with reference to this question, say:

"Having rejected the application (to reinstate) it became the company's duty to return applicant's money. This has been placed in a special suspense account in trust pending final action on the application. Refund was made by check drawn in Mr. Sullivan's favor."

Accompanying the return of the check was a letter signed by the general manager:

"We regret to inform you that your application for reinstatement of the above numbered policy has been declined by our Medical Board. We are therefore herewith refunding to you your remittance of $84.06, which you paid here on the 24th of this month. Your receipt was made up subject to the approval of the Health Statement, and as it was not approved, this receipt No. 6665 has been cancelled and your payment of $84.06 herewith enclosed."

There is nothing in the correspondence or in the check, itself, or in the attitude of the defendant company, to show any intent or attempt to settle a disputed claim. There is not in the record even a recognition that the money returned belonged to the company or that it was being paid to the plaintiff. All they claim is that the money was held by them in trust for the insured, and that they were returning to the cestui que trust the money that was already his.

The definition of an "accord and satisfaction" is:

"An accord is an agreement whereby one of the parties undertakes to give or perform, and the other to accept in satisfaction of a claim, liquidated or in dispute and arising either from contract or from tort, something other than or different from what he is or considers himself entitled to. And a satisfaction is the execution of such agreement." 1 C. J. p. 523.

None of these elements are found in the transaction as interpreted and acted upon by the company. There is nothing more in the action of the defendant in the mailing of the check to the insured than a refusal to recognize the policy as in force either under a waiver or by virtue of a reinstatement. If there was neither waiver nor reinstatement, then it was the defendant's duty to return the money—nothing more and nothing less. If the policy was in force either because of reinstatement or because of waiver, then it was not in the power of the defendant to defeat the rights of plaintiff by returning the pre-

mium money he paid and refusing to accept it. Such acts do not constitute accord and satisfaction. We think plaintiff's evidence is sufficient to take the case to the jury on the question of waiver of prompt payment of the premium. If plaintiff should fail on that issue, her evidence is insufficient to take the case to the jury on the issue of reinstatement. The contract provision is that "the policy may be reinstated at any time upon evidence of insurability satisfactory to the company." The evidence of insurability was not satisfactory to the company, and it promptly declined to reinsure, so notified the insured, and returned the premium money deposited with it, and, according to the testimony of the plaintiff, the company officers and employees refused to tell her the details of the information they had obtained reflecting on her husband's health. She was informed by letter, however, that the risk had been declined by the "Medical Board." . The insured had a cause of action at once to compel reinstatement if he could show himself a satisfactory risk and that the company had acted arbitrarily. This was not done. A year later, after he died, his widow brought this suit. While her evidence tends to show the formal requisites were met and the yellow slip was filled out and filed, it fails to show that the insured was in fact in good health at the time application for reinstatement was made and denied. In his application for reinstatement the insured represented he was then in "good health." The company, by reason of independent investigation, thought otherwise. The company had a right to make such investigation as it saw fit to determine for itself if the applicant for reinstatement was in fact in good health. Before plaintiff can recover—or have her case submitted to the jury—she must show that the company declined the risk arbitrarily and capriciously or in bad faith. To show this, she must prove that not only the formal requisites were met, but that the statements made by the insured representing himself to be in good health were in fact true. *Muckler* v. *Guarantee Fund Life Ass'n*, 50 S. D. 140, 208 N. W. 787. This she has

failed to do. She has produced no evidence to show that the insured was at the time in good health or in an insurable condition. She has merely proved that the forms were complied with and that the company refused to disclose to her its reasons for denying the risk. As to this issue, the trial court should be sustained.

The judgment is reversed, and the cause remanded to the district court of Salt Lake county, with directions to grant a new trial in accordance with the views herein expressed. Costs to appellant.

ELIAS HANSEN, C. J., and FOLLAND, EPHRAIM HANSON, and MOFFAT, JJ., concur.

WOLFE, J., being disqualified, did not participate herein.