Linda POLLOCK, Plaintiff-Appellant,

v.

NEW YORK LIFE INSURANCE COMPANY, a corporation, Defendant-Appellee.

No. 80–2203.

United States Court of Appeals, Tenth Circuit.

Nov. 4, 1982.

---

George B. Handy, Ogden, Utah, for plaintiff-appellant.

Ricardo B. Ferrari, Salt Lake City, Utah, for defendant-appellee.

Before DOYLE, McKAY and LOGAN, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

The plaintiff appeals from a judgment of the United States District Court for the District of Utah, Northern Division. Trial was to the court without a jury and finding was for the defendant insurance company, the holding being that no cause of action on the insurance contract existed. The trial court decided the case after hearing all the evidence presented by both sides. This being a diversity case, the law of Utah is applicable. There were two policies involved. These were written by the New York Life Insurance Company. The total amount of the insurance was $50,000. Premiums were paid on a monthly basis on a plan which involved presentation to the bank each month of a check in the amount of the premium, payable to the New York Life. On November 18, 1978 the premium was not paid in accordance with the policies and, although the premium was due November 18, 1978, it lapsed on January 1, 1979.[1]

On January 1, 1979 the insured, Richard Pollock, died. The district court found that at the time of the insured's death the policies were no longer in force and had not been reinstated. The policy contained a provision with respect to reinstatement.[2] It is to be noted that at the time of the insured's death the policies had no cash value. They had been in effect for slightly more than one year.

At all times material to this action Mr. James Loosemore served as an apprentice field underwriter for New York Life's Og-

---

[1] The policies contain the following language regarding non-payment of premiums and the grace period:

4. Payment of Premiums . . .
After payment of the first premium, failure to pay a premium on or before its due date, to the Company at its Home Office or to a duly authorized Officer Manager of the Company, will constitute default in payment of premium.

. . . . .

Grace Period—A grace period of thirty-one days will be allowed for payment of a premium in default, during which time this policy will continue in force. If a premium that falls due while this policy is a Term policy remains unpaid after expiration of the grace period, insurance under the policy will thereupon terminate and any dividend credits will be payable to the Owner in a single sum. If a premium that falls due while this policy is a Whole Life policy remains unpaid after expiration of the grace period, insurance will be in force only to the extent provided under the policy's Non-Forfeiture provisions.

[2] 12. Reinstatement—Within five years after default in payment of premium, this policy may be reinstated upon receipt by the Company of (a) evidence of insurability satisfactory to the Company, (b) payment of all overdue premiums with interest at 6% per annum from their respective due dates and (c) payment of any indebtedness outstanding at the end of the grace period, with compound interest at 6% per annum, plus any outstanding indebtedness incurred thereafter. However, if the Company receives the payments required under (b) and (c) within thirty-one days after expiration of the grace period for payment of the premium in default, the Company will not inquire into, nor require submission of, evidence of insurability but, in such case, reinstatements shall not take effect unless the Insured was living when such payments were received.

den, Utah office. Jean Cobia was office manager of that same office. William McCarthy was an associate death claims analyst at the home office in New York. The policies had been sold by Mr. Loosemore to Mr. Pollock and Loosemore was a friend of both Mr. and Mrs. Pollock.

The trial court found that Mr. Pollock died on January 1, 1979; that a daughter of Mr. and Mrs. Pollock telephoned Loosemore to advise him of this fact. On the 2nd of January Loosemore found a copy of a document in which he was advised that the November 1978 payment on the Pollock policies had not been paid. Loosemore was concerned and on January 2nd he discussed the matter with his superior, Ashby, and with Cobia. As a result of this, it was decided that the delinquent premium of $82.91 ought to be collected from the plaintiff. Accordingly, on January 8, 1979 Loosemore went to the plaintiff's house and obtained the $82.91 in cash. Neither at that time, nor at any time thereafter, was the plaintiff expressly told, either in writing or orally, that the premium was being accepted but subject to all of the terms and conditions of the policies. Loosemore did tell her at that time that she didn't have to worry about the policies, that New York Life was a good company and would be fair with her. Loosemore also told her that because of the delinquency in the payment of the premium there was a "slight problem." [3]

Loosemore testified in court that his relationship with the Pollocks was as an insurance agent but also as a friend. Certainly Loosemore did as much as could possibly be expected in protecting the rights of Mrs. Pollock. Had it been up to Loosemore she would have been paid the $50,000.

At the time that the premium was paid over Loosemore gave plaintiff no receipt. He then took that sum of money to the Ogden office and on that same day delivered it to Cobia, the office manager. The latter had been concerned since learning of Mr. Pollock's death about what to do with the premium once it was obtained. On January 10, 1979, McCarthy called Cobia on the phone and told her that the premium should be accepted and that a conditional receipt should be prepared, backdating it to January 8, 1979. McCarthy further advised Cobia that the premium ought to be sent to defendant's service office in Seattle. Cobia did this on January 10th and on that same date gave the conditional receipt to Loosemore who then placed it in a file that he kept relative to Mr. Pollock's insurance.

The facts are not disputed for the most part but there was some difference as to when the plaintiff was advised that the defendant would not accept the premium and pay on the policies. Plaintiff maintained that she was not advised of this until April 1979, or, at the earliest, late March of that year. The trial court, however, found that from the beginning of plaintiff's discussions with Loosemore and Ashby, following the death of her husband, that she was advised and knew that there was a problem as to whether the premium would be accepted and the proceeds paid. She learned this in her conversation with Loosemore on January 8, 1979. On or about January 29, 1979, she saw or was told about a letter dated January 23, 1979, from an associate claims analyst of the defendant addressed to Loosemore advising the payment of premium of $82.91 was not to be accepted and the proceeds of the policies would not be paid. Then on February 7, 1979 plaintiff received in the mail a check from defendant in the amount of $82.91, the stub of which advised her that it was the refund of the premium. The trial court found that there was no occurrence after that from which plaintiff could reasonably have concluded that the defendant had changed its mind. Nevertheless, Loosemore and Ashby continued to encourage her and advise her to the

---

**3.** Plaintiff testified that, at the time the premiums were solicited and accepted by Loosemore, she was given no indication that there were any contingencies, conditions or uncertainties as to whether or not the Company would accept the premium and reinstate the policies. Loosemore testified, and the trial court found as a matter of fact, that Mrs. Pollock was told by the agent that there might be problems since the premium was delinquent.

effect that the defendant might pay the $50,000. For example, and toward this end, Loosemore advised the plaintiff at the time she received the premium refund that she should not cash that check and he took possession of the check from her. It remained in his possession until June of 1979 at which time Loosemore sent it to the plaintiff's attorney, who had already filed the lawsuit.

The trial court's conclusion was that the withholding of the premium refund in the amount of $82.91 after February 7, 1979 was not the official act of the company. It was the act of the plaintiff or persons acting on her behalf.

The trial court heard testimony of witnesses, received exhibits and heard the arguments of counsel. Prior to the trial defendant moved for a judgment on the pleadings. At the conclusion of plaintiff's case, the defendant moved for a directed verdict. The court denied both of these motions and granted a judgment of no cause of action on plaintiff's complaint. The court awarded no costs.

Based upon the findings and the evidence the trial court concluded as a matter of law that the life insurance policies lapsed, by their terms, prior to January 1, 1979 and never were reinstated. A waiver, the court held, is an intentional relinquishment of a known right. The burden of proving a waiver was on the plaintiff and this plaintiff did not meet. Thus the New York Life did not waive its right to enforce the lapse of the policies and any withholding of plaintiff's refund check was her act or an act done on her behalf and not an act of defendant.

Plaintiff made a motion to alter or amend the judgment, and also for a new trial, both of which were denied by the trial court.

## PLAINTIFF'S CONTENTIONS

It is contended by plaintiff that defendant waived any rights to terminate the policies for non-payment of the November premium since the company accepted the late premium with knowledge that the policy had lapsed and that the insured had died. Plaintiff relies, in contending that there was a waiver, on the fact that no conditions or reservations were communicated to plaintiff when the premium was paid. Loosemore, the field underwriter, was an agent of the company when he accepted the late payment, she argues. Furthermore, the action of McCarthy, the associate death claims analyst in the home office, who approved the conditional acceptance of the premium, constituted a waiver of the late payment of the premium. She also maintains that the actions of the two officers waived the provision in the policy which states that only the President, Executive Vice President, Vice President, Treasurer or Secretary of the company at its home office can waive any of the company's rights or requirements.

Plaintiff's final contention is that Utah Code Annotated §§ 31–19–18 and 31–19–26 require that any modifications of an insurance contract must be in writing do not apply in the present case since the sections merely codify the parol evidence rule as it applies to insurance contracts and do not do away with the doctrine of waiver.

A definition of the term waiver in the present context was given by the Supreme Court of Utah as an intentional relinquishment of a known right. *Phoenix Insurance Co. v. Heath,* 90 Utah 187, 61 P.2d 308 (1936). The court outlined the test to be applied in determining whether a waiver exists:

> To constitute a waiver, there must be an existing right, benefit, or advantage, a knowledge of its existence, and an intention to relinquish it. It must be distinctly made, although it may be express or implied.

*Id.* at 311–312.

The Supreme Court of Utah has also held that the doctrine of waiver asserted against insurance companies to avoid strict enforcement of conditions in their policies, "can only be invoked where the conduct of the companies has been such as to induce action in reliance upon it, and where it would

operate as a fraud upon the assured if they [the insurance companies] were afterwards allowed to disavow their conduct and enforce the conditions." This was *Ballard v. Beneficial Life Ins. Co.,* 82 Utah 1, 21 P.2d 847, 857 (1933). In determining the existence of a waiver there must be careful consideration and perhaps deference given to the findings of facts of the trial judge since "[w]hether a waiver has taken place or not ordinarily depends upon the peculiar facts and circumstances of a given case, and, in most instances, presents a question of fact rather than of law, or at least a mixed question of law and fact." *Loftis v. Pacific Mutual Life Ins. Co.,* 38 Utah 532, 114 P. 134, 139 (1911).

This court must also carefully consider the Utah Supreme Court's pronouncement that a liberal interpretation must be given to the acts and conduct of a party holding a right of forfeiture and "[a]ny acts or statements suggesting an intention to keep a contract alive are liberally construed as a waiver of the right of forfeiture." *Parker v. California State Life Ins. Co.,* 85 Utah 595, 40 P.2d 175, 177 (1935); *cf. Loftis, supra,* 114 P. at 139 ("Where a waiver prevents a forfeiture, the law ordinarily permits a liberal construction to be placed on the acts of the party waiving with the view of bringing about a waiver of such forfeiture.") In the finding favoring the defendant the trial court used the test set forth in the *Phoenix, supra,* case.

*Phoenix* requires a distinctly made intentional relinquishment of a known right. The facts here are not such as to indicate a relinquishment, rather the indication is that a relinquishment was not given. The evidence does not demonstrate that the premium was paid on the basis that the plaintiff and the insurance company knew that the policies had lapsed and that the company was intentionally waiving that lapse and was willing to forego whatever rights it had under the policies. Plaintiff was told at the time the late premium was collected that there might be problems with her claim since the premium was late and the insured was dead. Further, the condi-

tional receipt issued by defendant failed to evidence the intent to relinquish the company's rights. This receipt was used by the trial court to show the company's intent even though it was not immediately given plaintiff. Also, when an investigation was made by the company and when it determined that the policies had in fact lapsed plaintiff was advised of the company's position and the premium was promptly refunded. True, the refund check was held by Loosemore for some time before it was returned to plaintiff. The trial court found that any withholding of the premium refund after February 7, 1979 was the act of persons acting on plaintiff's behalf and was not in any way the official act of the company. This seems to be true, however it seems likely that the company left the matter open so as to convince the plaintiff that a careful consideration was given to her claim. In any event the court refused to find that there was a waiver by the company and found that there was no evidence to indicate that the insured understood or was led to believe that the policy was still alive and it could be reinstated without paying back installments and by providing evidence of insurability in accordance with the provision of the policy as set forth above in footnote # 2. The last letter sent by the company was unequivocal and any premium paid would be conditionally accepted, conditioned on the return of a health form which evidenced insurability.

The decision in *Ballard* was based on a reliance-fraud standard. Applying this standard to the present case there is no arguable basis for finding that plaintiff would have been defrauded by the company in not accepting the late premium. At the time the premium was collected, it was made known to plaintiff there might be problems given the tardiness of the payment. Also, the premium was refunded when the company determined that it would not be accepted. So it cannot be said that the company induced reliance; in fact it gave little in the way of encouragement to the plaintiff.

In *Sullivan v. Beneficial Life Ins. Co.,* 91 Utah 405, 64 P.2d 351 (1937) there was some

positive representation made to the wife of the insured. When she made the payment receipt was issued and no conditions were attached when the receipt was given. Indeed when the beneficiary called the insurer on the telephone concerning the late payment of premium, she was told that she need not worry.

The insurance company in Sullivan claimed the policy lapsed and that no reinstatement occurred since Mrs. Sullivan failed to obtain evidence of the beneficiary's good health. The court held that plaintiff's evidence, as set forth above regarding communication by the company through its agents and the company's acceptance of the late payment, was all sufficient to take to the jury the question of waiver. The court reversed and remanded with directions to grant a new trial.

See *Loftis, supra,* 114 P. at 138. It quotes from *Schmertz v. U.S. Life Insurance Co.,* 118 F. 250, 256 (3rd Cir. 1902). The statement from the *Schmertz* case is somewhat more liberal than that of the Utah cases in that there is an implied waiver where the conduct of the insurer, dealing with the insured and others similarly situated, has been such as reasonably to induce a belief on the part of the insured that if the premium be not paid by the stipulated date, a forfeiture will not be enforced, if payment be made within a reasonable period thereafter.

Regardless of which test is applied the evidence is such that it cannot be said that an unequivocal position was taken or that any positive representations were made by the company to Mrs. Pollock. The company was doing no more than studying the situation.

Inasmuch as the facts support the trial judge's decision, it is impossible for this court to vacate that judgment. Accordingly the judgment of the district court should be and the same is hereby affirmed.