**Blaketta ALLEN, Plaintiff and Appellant,**

v.

**PRUDENTIAL PROPERTY AND CASUALTY INSURANCE COMPANY, a corporation, Defendant and Appellee.**

No. 890408.

Supreme Court of Utah.

June 22, 1992.

T.J. Tsakalos, Salt Lake City, for Prudential.

H. Ralph Klemm, Salt Lake City, for Allen.

ZIMMERMAN, Justice:

Blaketta Allen brought a district court action for declaratory judgment to invalidate a household exclusion in her homeowner's insurance policy issued by Prudential Property and Casualty Insurance Company. The district court granted summary judgment for Prudential, and Allen appeals. Allen initially claims that the district court erred in failing to enter a brief statement of the grounds for its decision, as required by Utah Rule of Civil Procedure 52(a). Addressing the merits, Allen challenges the district court's refusal to invalidate the household exclusion, claiming that the exclusion violates her "reasonable expectations" of insurance coverage. We reject Allen's contentions and affirm the grant of summary judgment.

■ In considering an appeal from a summary judgment, we view the facts in a light most favorable to the nonmoving party. *Blue Cross & Blue Shield v. State*, 779 P.2d 634, 636 (Utah 1989). We state the facts in this case accordingly.

In 1981, Allen's husband met with a Prudential agent to discuss homeowner's insurance. During the meeting, Mr. Allen completed an application for a homeowner's policy under which Prudential would insure the Allens' home and provide liability coverage against accidents occurring on the property. At the meeting, the agent did not mention the household exclusion, but advised Mr. Allen that he should review the policy when he received it. The Allens received the policy in the mail approximately two months after the meeting. Attached to the policy was an endorsement excluding members of the Allens' household from liability coverage. Neither Allen nor her husband read the endorsement.

Approximately three years after the agreement went into effect, the Allens' two-year-old son was injured when Allen spilled a pot of boiling water on him. After the accident, Mr. Allen contacted the Prudential agent, seeking recovery against

the policy for his wife's accidental injury of his son. The agent, for the first time, orally informed Mr. Allen of the household exclusion. Based on the exclusion, Prudential denied coverage.

Allen filed a declaratory judgment action seeking to invalidate the exclusion on the grounds that the insurance agreement was an adhesion contract and that the existence of the exclusion violated her reasonable expectations. Prudential moved for summary judgment, arguing, *inter alia,* that the exclusion was unambiguous and that it did not violate public policy. The district court granted Prudential's motion, stating simply that it was doing so for reasons "set forth in the arguments of defendant." Allen appeals.

We address two of Allen's three challenges to the trial court's grant of summary judgment.[1] First, she contends that the trial court committed reversible error in failing to issue a brief written statement of the grounds for its decision, as required by Utah Rule of Civil Procedure 52(a). Second, addressing the merits, Allen contends that the household exclusion should be held unenforceable. She claims that the insurance agreement was an adhesion contract and that a provision in an adhesion contract which violates the insured's reasonable expectations of coverage is invalid. We will address these contentions in order.

As a threshold matter, we note the applicable standard of review. By definition, a summary judgment is based solely on conclusions of law. Therefore, we review a summary judgment for correctness, without deferring to the trial court's legal determinations. *See, e.g., Bonham v. Morgan,* 788 P.2d 497, 499 (Utah 1989); *Transamerica Cash Reserve, Inc. v. Dixie Power & Water, Inc.,* 789 P.2d 24, 25 (Utah 1990).

We begin with Allen's contention that the trial court's failure to issue a brief written statement of the grounds for its decision violates Utah Rule of Civil Procedure 52(a). The last sentence of rule 52(a) states, "The court shall issue a brief written statement of the ground for its decision on all motions [for summary judgment] granted ... when the motion is based on more than one ground." Utah R.Civ.P. 52(a); *see Lowe v. Sorenson Research Co.,* 779 P.2d 668, 669 n. 1 (Utah 1989). Although Prudential advanced a number of arguments in support of its motion for summary judgment, the trial judge's short statement of his ruling said merely that "under the facts of this case ... the motion for summary judgment of the defendant is proper as set forth in the arguments of [Prudential]."

Clearly, the trial judge did not comply with the requirements of rule 52(a). We recently added the final sentence to rule 52(a) to aid our review of summary judgments in which the parties have advanced a number of alternate grounds; otherwise, we could not identify the basis for a trial judge's ruling. When reviewing trial court decisions, we presume them to be correct and search for grounds upon which they may be upheld. *E.g., College Irr. Co. v. Logan River & Blacksmith Fork Irr. Co.,* 780 P.2d 1241, 1244 (Utah 1989). As a practical matter, however, that presumption has little operative effect when members of this court cannot divine the trial court's reasoning because of the cryptic nature of its ruling. Consequently, both the interest of the trial court in having a correct ruling sustained and the interest of the parties in having a properly framed appellate proceeding are better served when the trial judge complies with rule 52(a). Be that as it may, some trial judges cling to the view that the less explanation given for their rulings the better. They would prefer to remain silent and rely on the presumption that their rulings are correct. As we have noted, the wisdom of that view is questionable, but a trial

[1]. Allen also appealed on the ground that the district court erred in failing to sign an order to publish the depositions of Allen and her husband. She contends that we must reverse the summary judgment because the district court relied on the Allens' depositions as the factual basis for its ruling but neglected to formally publish them. Prudential did not controvert Allen's assertion that the trial judge failed to sign the publication order, claiming instead that such a failure has no legal significance. However, the trial record before this court reveals that the order was signed by the trial judge two months before entry of the court's judgment. Consequently, there is no issue before us.

judge's failure to comply with the last sentence of rule 52(a) alone is not reversible error absent unusual circumstances. *See Neerings v. Utah State Bar*, 817 P.2d 320, 323 (Utah 1991). We find no need to discuss in the abstract what may constitute unusual circumstances, but note that they are not present here.

Having disposed of her procedural objection, we turn to Allen's argument on the merits. Allen claims that the district court erred in failing to invalidate the household exclusion because the court did not recognize the "reasonable expectations doctrine."[2] In general, the reasonable expectations doctrine authorizes a court confronted with an adhesion contract to enforce the reasonable expectations of the parties under certain circumstances. *See* Roger C. Henderson, *The Doctrine of Reasonable Expectations in Insurance Law After Two Decades*, 51 Ohio St.L.J. 823 (1990) [hereinafter Henderson].

Allen offers three alternative formulations of the reasonable expectations doctrine and seeks their application to her case. Underlying all her arguments is the premise that she has raised a factual issue as to whether she, in fact, expected the household exclusion to be contained in the Prudential policy and whether that expectation was reasonable. For purposes of this decision, we assume that she has raised such factual questions.

Allen's three formulations of the reasonable expectations doctrine can be summarized as follows. First, she contends that the insurance contract with Prudential is an adhesion contract and reasons that she therefore is entitled to have the court enforce her reasonable expectations. Second, she argues that the trial court should have applied a variant of the reasonable expectations doctrine discussed in a recent Utah Court of Appeals decision, *Wagner v. Farmers Insurance Exchange*, 786 P.2d 763 (Utah Ct.App.1990). Under this theory, she claims, courts must enforce the reasonable expectations of the insured where the insurer has a reason to believe that the insured would not have assented to a particular term had he or she known of its presence. Third, Allen appears to argue for a version of the doctrine that focuses on whether the exclusion at issue was ambiguous. We assume that she is urging us to adopt a rule that would allow a court to interpret ambiguous provisions so that the insured's reasonable expectations are fulfilled.

These three variations are more easily understood when placed in a historical context. The intellectual foundation of the reasonable expectations doctrine was initially formulated by Professor, now Judge, Robert Keeton as an overarching set of principles to assist in explaining the results of disparate insurance law decisions that appeared to be based on a number of different rationales. Henderson at 823, 825 (citing Robert E. Keeton, *Insurance Law Rights at Variance with Policy Provisions*, 83 Harv.L.Rev. 961 (part 1) & 83 Harv.L.Rev. 1281 (part 2) (1970)). Courts in various states have since attempted to massage these principles into a legal rule through case-by-case development. Consequently, different versions of the doctrine exist.

One commentator, after surveying the jurisdictions purporting to apply the reasonable expectations doctrine, classifies the legal rules resulting from these various approaches as follows: (i) construction of an ambiguous term in the insurance contract to satisfy the insured's reasonable expectations; (ii) refusal to enforce the "fine print" of an insurance contract because it limits more prominent provisions giving rise to the insured's expectations; and (iii) refusal to enforce an insurance contract provision when it would frustrate the reasonable expectations of coverage created by the insurer outside of the contract. Stephen J. Ware, Comment, *A Cri-*

---

**2.** Allen uses the term "adhesion contract theory" to describe the reasonable expectations doctrine, apparently following the nomenclature used by the dissent in *State Farm Mutual Automobile Insurance Co. v. Mastbaum*, 748 P.2d 1042, 1047 (Utah 1987) (Durham, J., dissenting). The term "reasonable expectations doctrine" more appropriately describes the doctrine. *See generally* Roger C. Henderson, *The Doctrine of Reasonable Expectations in Insurance Law After Two Decades*, 51 Ohio St.L.J. 823 (1990).

*tique of the Reasonable Expectations Doctrine*, 56 U.Chi.L.Rev. 1461, 1467 (1989) [hereinafter Ware]; *see also* Mark C. Rahdert, *Reasonable Expectations Reconsidered*, 18 Conn.L.Rev. 323, 335–36, 345 (1986) (discussing the various approaches as either "weaker" or "stronger" versions) [hereinafter Rahdert]. Allen's suggested alternative rationales for permitting her to go to trial on the merits under the reasonable expectations doctrine largely reflect these various versions.

3. The decisions of the Iowa and New Jersey Supreme Courts are illustrative. The Iowa Supreme Court first adopted a rather limited version of the reasonable expectations doctrine, applying it only to situations in which a layperson would not understand the exclusion or in which the insurer created an expectation of coverage. *See Rodman v. State Farm Mutual Auto. Ins. Co.*, 208 N.W.2d 903, 908 (Iowa 1973). The court then expanded the doctrine's scope to enforce the reasonable expectations of the insured even though the exclusion was clear and the insurer's actions did not create the expectations. *See C & J Fertilizer, Inc. v. Allied Mutual Ins. Co.*, 227 N.W.2d 169, 176–77 (Iowa 1975). The Iowa Supreme Court's latest cases signal a retreat to a *Rodman*-type formulation of the doctrine, although the exact scope remains unclear. *See, e.g., Chipokas v. Travelers Indem. Co.*, 267 N.W.2d 393, 396 (Iowa 1978) (refusing to enforce insured's expectations because a layperson would understand disputed exclusion and insurer did not create expectation of coverage); *Farm Bureau Mutual Ins. Co. v. Sandbulte*, 302 N.W.2d 104, 112–14 (Iowa 1981) (denying insurer relief because ordinary layperson would not misunderstand disputed term and term was not bizarre or oppressive, did not eviscerate terms explicitly agreed to, and did not eliminate dominant purpose of transaction); *Grinnell Mutual Reinsurance Co. v. Voeltz*, 431 N.W.2d 783, 786 (Iowa 1988) (quoting with approval from *C & J Fertilizer* but applying *Rodman* formulation of reasonable expectations doctrine to invalidate exclusion). *See generally* Rahdert at 357–61 (describing evolution of reasonable expectations doctrine in Iowa); Joseph E. Minnock, Comment, *Protecting the Insured from an Adhesion Insurance Policy: The Doctrine of Reasonable Expectations in Utah*, 1991 Utah L.Rev. 837, 855–61 (same).
   The New Jersey Supreme Court initially adopted an apparently broad version of the doctrine that could be used regardless of whether the disputed policy language was ambiguous or clear. *See, e.g., Kievit v. Loyal Protective Life Ins. Co.*, 34 N.J. 475, 170 A.2d 22, 24, 26–27 (1961) (enforcing insured's expectations even though disputed exclusion was unambiguous because exclusion undermined purpose of policy). The court later restricted its view of the doctrine, applying it only when the disputed lan-

Acceptance of the doctrine, regardless of the version, has not been without criticism. Henderson at 823 & n. 7; Rahdert at 368–73. Some of this criticism arises because a number of states have struggled with the doctrine's scope, leaving a trail of inconsistent decisions and creating an obviously uncertain future for the doctrine in those states.[3] At least two states, Idaho[4] and Pennsylvania,[5] appear to have initially recognized broad versions of the doctrine but later retreated to limit the doctrine's con-

guage was ambiguous. *See, e.g., DiOrio v. New Jersey Mfrs. Co.*, 79 N.J. 257, 398 A.2d 1274, 1280–81 (1979) (rejecting reasonable expectations argument because policy language was unambiguous); *Weedo v. Stone–E–Brick, Inc.*, 81 N.J. 233, 405 A.2d 788, 794–95 (1979) (holding that insured's reasonable expectations will be enforced only if disputed language is genuinely ambiguous). The New Jersey Supreme Court appears now to have adopted a very broad version of the doctrine. *See, e.g., Sparks v. St. Paul Ins. Co.*, 100 N.J. 325, 495 A.2d 406, 414–15 (1985) (invalidating exclusion because it did not conform to "objectively reasonable expectations" and expressly declining to establish precise standards to determine reasonableness). *See generally* Rahdert at 361–64 (describing evolution of reasonable expectations doctrine in New Jersey).

4. *Compare Corgatelli v. Globe Life & Accident Ins. Co.*, 96 Idaho 616, 533 P.2d 737, 740–41 (1975) (plurality) (adopting broad version of reasonable expectations doctrine without delineating scope but holding that it is not dependent on presence of ambiguity) *with Casey v. Highlands Ins. Co.*, 100 Idaho 505, 600 P.2d 1387, 1391 (1979) (rejecting reasonable expectations doctrine as unnecessary in light of traditional doctrines) *and Foremost Ins. Co. v. Putzier*, 102 Idaho 138, 627 P.2d 317, 321, 324 (1981) (noting that reasonable expectations doctrine has been rejected but that insured's reasonable expectations are considered when resolving ambiguous provisions). *See generally* Rahdert at 354–57 (describing evolution of reasonable expectations doctrine in Idaho).

5. *Compare Hionis v. Northern Mutual Ins. Co.*, 230 Pa.Super. 511, 327 A.2d 363, 365–66 (1974) (holding that exclusions, even if unambiguous, must be explained to insureds before they can be enforced) *and Collister v. Nationwide Life Ins. Co.*, 479 Pa. 579, 388 A.2d 1346, 1353–54 (1978) (holding that insured's reasonable expectations, as determined by analyzing totality of circumstances, should be enforced even if policy's limiting language is unambiguous) *with Standard Venetian Blind v. American Empire Ins. Co.*, 503 Pa. 300, 469 A.2d 563, 566–67 (1983) (explicitly rejecting *Hionis* and implicitly

flict with the freedom of parties to contract. Today, after more than twenty years of attention to the doctrine in various forms by different courts, there is still great uncertainty as to the theoretical underpinnings of the doctrine, its scope, and the details of its application. *See, e.g.,* Henderson at 824, 838; Rahdert at 345, 370–71.

■ With this background, we turn to Allen's first argument, i.e., that because her homeowner's policy is an adhesion contract, the court should have enforced her allegedly reasonable expectations as a matter of course. Allen overreaches the rationale for the doctrine, even at its broadest. The fact that an insurance contract is adhesive is no reason, in itself, to enforce what might be found to be the reasonable expectations of the insured when those expectations conflict with the plain terms of the policy.[6] To our knowledge, no court has taken such an expansive view of the reasonable expectations doctrine, and Allen cites no authority to this effect.

The second version of the reasonable expectations doctrine advanced by Allen is more principled and better supported than her first. She asks that this court adopt the analysis suggested in *Wagner v. Farmers Insurance Exchange,* 786 P.2d 763 (Utah Ct.App.1990). Under the court of appeals' formulation, a court is to determine "first, whether the insurer knew or should have known of the insured's expectations; second, whether the insured created or helped to create these expectations, and third, whether the insured's expectations are reasonable." *Id.* at 766. "'In most cases, [the third] criterion will be met if one of the other two is....'" *Id.* at 768 (quoting Kenneth S. Abraham, *Judge-Made Law and Judge-Made Insurance: Honoring the Reasonable Expectations of the Insured,* 67 Va.L.Rev. 1151, 1180 (1981).

To bring herself within the ambit of this version of the doctrine, Allen makes the following argument: A year after she received the Prudential policy and two years before her son's accident, her husband met with the Prudential agent to increase the homeowner's policy's coverage because the family had just bought a trampoline. She alleges that her husband told the agent he wanted to make sure that "anyone" who was hurt on the trampoline would be covered. Thus, she argues, the agent knew or should have known that Mr. Allen expected the policy to cover the Allens' son. Allen further argues that the agent's failure to mention the existence of the exclusion when her husband made the statement "left the impression with Mr. Allen that his family was covered." She concludes, "Because of the agent's failure to meet his obligations at that stage, the insured's expectations were reasonable."[7]

disavowing *Collister* in holding that an unambiguous exclusion clause is valid by applying traditional contract principles). *But see Tonkovic v. State Farm Mut. Auto. Ins. Co.,* 513 Pa. 445, 521 A.2d 920, 924–25 (1987) (distinguishing *Standard Venetian Blind* but holding that a policy limitation on specifically requested coverage is not enforceable, even if unambiguous, unless it has been explained to insured). *See generally* Rahdert at 364–67 (describing evolution of reasonable expectations doctrine in Pennsylvania); Henderson at 829–31 (same).

6. *See* Rahdert at 338. In this context, we note that form contracts are essential to the economic viability of the insurance industry. *Id.;* William A. Mayhew, *Reasonable Expectations: Seeking a Principled Application,* 13 Pepp.L.Rev. 267, 270 (1986) [hereinafter Mayhew]. Yet, as recognized by the Arizona Supreme Court, which has adopted one of the broadest versions of the reasonable expectations doctrine in the country, "most insureds develop a 'reasonable expectation' that every loss will be covered by their policy." *Darner Motor Sales v. Universal Underwriters,* 140 Ariz. 383, 682 P.2d 388, 395 (1984).

7. In his concurring opinion, Justice Stewart asserts that Allen has not raised a factual question as to the objective reasonableness of her expectations. However, a close examination of his analysis demonstrates that he is not taking the facts in a light most favorable to the nonmoving party, as we are bound to do. *See Blue Cross & Blue Shield v. State,* 779 P.2d 634, 636 (Utah 1989). Rather, Justice Stewart weighs the evidence and makes a finding of fact that Allen's expectations could not be reasonable. The result is that by holding that Allen cannot proceed under his version of the doctrine, he de facto narrows the doctrine beyond anything that is argued for by this plaintiff or by Justice Durham in her dissent.

In making this argument, Allen asks us to adopt a doctrine that considerably modifies the legislatively expressed public policy underlying the regulation of the insurance industry. The theory she advances essentially would allow a court to invalidate a clear provision of an insurance contract, even if the insured had not read it, if the finder of fact is convinced that the insurer's agent knew or should have known that the insured had expectations that contradicted the policy's language and that the agent created or helped to create those expectations. For the reasons set forth below, we decline to make such a change in Utah law.

As a general matter, we are unwilling to make sweeping modifications in the public policy that underlies the regulation of the insurance industry in the absence of legislative direction. This approach is counseled by the active and preeminent role the legislative and executive branches have taken in this area.

The legislative and executive branches' occupation of this field is evidenced by title 31A of the Code, which comprises the "Insurance Code" and sets out a comprehensive regulatory framework for the insurance industry.[8] Utah Code Ann. §§ 31A–2–101 to –29–123 (1991). Section 31A–2–101 of this title creates an "Insurance Department" to administer the Insurance Code. *Id.* § 31A–2–101. Through its commissioner, the Insurance Department may promulgate rules to implement the provisions of the title and investigate violations. *Id.* § 31A–2–201; *see* Utah Admin.Code R590–66–1 to –145–9 (1992). Preprinted policies for household insurance, such as the Prudential policy at issue in this case, must be filed with the commissioner. Utah Code Ann. § 31A–21–201(1) (1991). The commissioner may disapprove a preprinted policy at any time if it is found to be "inequitable, unfairly discriminatory, misleading, deceptive, obscure, or encourages

misrepresentation." *Id.* § 31A–21–201(2)(a)(i).[9] Thus, the validity of preprinted insurance contracts is premised on executive approval, a regulatory mechanism that the *Wagner* version of the reasonable expectations doctrine would largely undermine.

Our prior case law demonstrates our tradition of deferring to the legislature on questions of general policy when considering the validity of insurance policies. When we have invalidated a provision of an insurance agreement, generally we have grounded the ruling in legislative policy. For example, in *General Motors Acceptance Corp. v. Martinez*, 668 P.2d 498 (Utah 1983), we invalidated a provision in a credit life and disability insurance agreement excluding coverage because the insured had not been informed in writing of the exclusion. *Id.* at 501. In so ruling, we relied on a statutory requirement that all credit life and disability insurance be evidenced by an individual policy or group certificate stating " 'the term and coverage including any exceptions, limitations and restrictions' " and that the policy or agreement " 'be delivered to the debtor.' " *Id.* (quoting Utah Code Ann. § 31–34–6(1), (2) (1953) (repealed 1986).

Three years later, in *Farmers Insurance Exchange v. Call*, 712 P.2d 231 (Utah 1985), we held that a household exclusion in an automobile liability insurance agreement was void to the extent that the exclusion conflicted with the minimum coverage requirements of the Utah Automobile No–Fault Insurance Act. *Id.* at 234–36 (citing Utah Code Ann. §§ 31–41–1 to –13 (1953) (repealed 1986)). Two members of this court and a district judge sitting by designation went beyond the legislative policy expressed in the no-fault statute to hold that, to the extent the exclusion limited liability under the policy in an amount in excess of the statutory minimum, the exclusion was invalid because the insurer had

---

8. Title 31A became effective July 1, 1986, and recodified the prior Insurance Code in title 31. 1985 Utah Laws ch. 242. Many of the provisions in title 31A mirror provisions in title 31, and both titles are equally comprehensive in their scope and regulatory effect.

9. A similar provision was in effect when the Prudential policy at issue in this case was signed. Utah Code Ann. §§ 31–19–9(1), –10 (1953) (repealed 1986).

failed to inform the insured specifically of the exclusion. *Id.* at 236–37. This result was reached by extending the disclosure requirement articulated in *Martinez* for credit life and disability insurance to automobile insurance, even though there was no comparable statute requiring disclosure for automobile insurance. *See id.* at 239–40 (Howe, J., dissenting). The majority reasoned, in part, "Without disclosure, the household exclusion clause fails to 'honor the reasonable expectations' of the purchaser, rendering the exclusion clause invalid as to the entire policy limits." *Id.* at 237 (citations omitted).

Two years after *Call,* in *State Farm Mutual Automobile Insurance Co. v. Mastbaum,* 748 P.2d 1042 (Utah 1987), we reaffirmed the principle of deferring to legislative policy regarding the general validity of insurance provisions. In that case, we upheld a household exclusion in an automobile liability insurance agreement in excess of the minimum required by statute because there were no other statutory bases for invalidating the provision beyond the minimum. *Id.* at 1044. Although the insured in *Mastbaum* raised a reasonable expectations argument, four members of this court found no reason to address it.[10]

Taken as a whole, these cases show our unwillingness to alter fundamentally the terms of insurance policies in the absence of legislative direction. They also show the consequent uneasiness of a majority of this court with the notion of a reasonable expectations doctrine. Today we again affirm the principle of deferring to legislative policy in considering the facial validity of insurance provisions.

■ Notwithstanding our deference to legislative policy in this area, we necessarily retain authority to invalidate insurance provisions that are found contrary to public policy as expressed in the common law of contracts that has not been preempted by legislative enactment. In this vein, we note that the reasonable expectations doctrine has been urged because of the supposed inadequacy of the existing equitable doctrines available to courts confronted with overreaching insurers. Joseph E. Minnock, Comment, *Protecting the Insured from an Adhesion Insurance Policy: the Doctrine of Reasonable Expectations in Utah,* 1991 Utah L.Rev. 837, 875. The difficulty with this logic is that no such inadequacy has been shown to exist in Utah. *See, e.g., id.* at 846–47 (noting that doctrine of unconscionability is not fully developed in Utah). It is not clear why estoppel,[11] waiver,[12] unconscionability,[13] breach of the implied duty of good faith and fair dealing,[14] and the rule that ambig-

**10.** In the plurality opinion, Justice Howe, joined by Chief Justice Hall, simply did not address the reasonable expectations argument. 748 P.2d at 1042–44. In my concurring opinion, joined by Justice Stewart, I refused to reach the argument because the reasonable expectations issue was not adequately presented on appeal. *Id.* at 1044 (Zimmerman, J., concurring). Justice Durham, who was the author of *Call,* proceeded to discuss the issue. *Id.* at 1047–49 (Durham, J., dissenting).

**11.** *See American W. Life Ins. Co. v. Hooker,* 622 P.2d 775, 779 (Utah 1980) (applying estoppel to insurer); *see also Mendez v. State Dep't of Social Servs.,* 813 P.2d 1234, 1236 (Utah Ct.App.1991) (describing elements of estoppel). *See generally* Annotation, *Doctrine of Estoppel or Waiver as Available to Bring Within Coverage of Insurance Policy Risks Not Covered by Its Terms or Expressly Excluded Therefrom,* 1 A.L.R.3d 1139 (1965 & Supp.1991); Mayhew at 293 ("Attempting to distinguish between reasonable expectations, estoppel, and unconscionability can be difficult because the doctrine of reasonable ex-

pectations, with its equity origins, often overlaps with the other two.").

**12.** *See Sullivan v. Beneficial Life Ins.,* 91 Utah 405, 426, 64 P.2d 351, 361 (1937) (applying waiver to insurer); *see also Anderson v. Brinkerhoff,* 756 P.2d 95, 98 (Utah Ct.App.1988) (describing elements of waiver). *See generally* 1 A.L.R.3d 1139.

**13.** *See Resource Mgmt. Co. v. Weston Ranch & Livestock Co.,* 706 P.2d 1028, 1040–43 (Utah 1985) (describing substantive and procedural unconscionability). *See generally* Donald M. Zupenec, Annotation, *Doctrine of Unconscionability as Applied to Insurance Contracts,* 86 A.L.R.3d 862 (1978 & Supp.1991); Scott B. Krider, Comment, *The Reconstruction of Insurance Contracts Under the Doctrine of Reasonable Expectations,* 18 J. Marshall L.Rev. 155, 173 (1984) (noting that unconscionability is promising alternative to reasonable expectations doctrine).

**14.** *See Beck v. Farmers Ins. Exch.,* 701 P.2d 795, 801 (Utah 1985) (holding that insurer has im-

uous language is to be resolved against the drafter,[15] for example, are insufficient to protect against overreaching insurers when applied on a case-by-case basis.[16]

We also recognize that the reasonable expectations doctrine was developed in part because established equitable doctrines were found to be inadequate theoretically. *See* Robert E. Keeton, *Insurance Law Rights at Variance with Policy Provisions*, 83 Harv.L.Rev. 961 (part 1) & 83 Harv.L.Rev. 1281 (part 2) (1970); *see also* William A. Mayhew, *Reasonable Expectations: Seeking a Principled Application*, 13 Pepp.L.Rev. 267, 269–72 (1986) (justifying adoption of reasonable expectations doctrine because courts misapply existing equitable doctrines and consequently create uncertainty). However, in this state, we have yet to address and develop fully any of the existing equitable doctrines available to an aggrieved insured. Also, our past decisions applying various existing equita-

ble doctrines to provide relief to aggrieved insureds have not changed those doctrines' traditional formulations unduly. Thus, even if we were free to do so in the absence of a legislative policy declaration to the contrary, we find no persuasive reason to attempt to craft a new and potentially sweeping equitable doctrine.[17] Therefore, we decline to adopt the *Wagner* reasonable expectations approach.

Our decision today to proceed interstitially with existing equitable doctrines rather than to adopt a new doctrine with unknown ramifications is consistent with the legislative policy underlying the Insurance Code. That Code expresses an intent that "freedom of contract" be maintained, Utah Code Ann. § 31A–1–102(7), and that written contracts be the primary means by which this freedom to contract be exercised. *See, e.g., id.* §§ 31A–21–301 to –404 (1991 & Supp. 1991) (setting forth detailed provisions au-

plied duty of good faith and fair dealing to insured based on insurance contract).

**15.** *See LDS Hospital v. Capitol Life Ins. Co.,* 765 P.2d 857, 858–59 (Utah 1988) (describing test to be applied in determining ambiguity of insurance contracts); *Hoffman v. Life Ins. Co. of N. America,* 669 P.2d 410, 417 (Utah 1983) (applying rule that ambiguities be resolved against drafter in construing insurance contract); *Phillips v. Utah Local Gov'ts Trust,* 660 P.2d 249, 250 (Utah 1983) (same).

**16.** In addition to the various equitable remedies, tort remedies may be available to an aggrieved insured under appropriate circumstances. For example, the plaintiff may be able to assert a claim for fraud, *see Crookston v. Fire Ins. Exch.,* 817 P.2d 789, 800 (Utah 1991), negligent misrepresentation, *see Culp Constr. Co. v. Buildmart Mall,* 795 P.2d 650, 654–55 (Utah 1990), or breach of fiduciary duty, *see Ammerman v. Farmers Ins. Exch.,* 19 Utah 2d 261, 265, 430 P.2d 576, 577–78 (1967). An insurance company may be vicariously liable for the tortious conduct of its agent, or it may directly incur tort liability by imputation of the agent's knowledge. *See Hodges v. Gibson Products Co.,* 811 P.2d 151, 156–57 (Utah 1991). An insurance company also may be liable for negligent hiring, supervision, or retention even if the employee is not acting within the scope of his or her employment. *See Stone v. Hurst Lumber Co.,* 15 Utah 2d 49, 386 P.2d 910 (1963).

**17.** We find it difficult to conceive why the version of the reasonable expectations doctrine Allen advances should be limited solely to insur-

ance contracts. *See* W. David Slawson, *The New Meaning of Contract: The Transformation of Contracts Law by Standard Forms,* 46 U.Pitt.L.Rev. 21, 52 (1984) (noting that reasonable expectations doctrine "lacks any principled justification for being limited to insurance policies"). *Compare, e.g.,* Mayhew at 271–72 (claiming that insurance contracts differ "substantially" from other adhesion contracts because insured typically retains right of cancellation without incurring untoward expenses or legal consequences) *with* Utah Code Ann. § 31A–21–303 (Supp.1991) (specifying narrow grounds on which an insurer may cancel a policy, such as failure to pay a premium when due, material misrepresentation, substantial and unforeseeable change in risk, or substantial breach; setting forth the procedure required for cancellation; and granting the insured a right to renewal). *But see generally* Rahdert at 339–41 (discussing several features of insurance contracts that the author believes creates an "enhanced" risk of unequal bargaining power compared to other types of adhesion contracts). Any of the considerations underlying application of the doctrine, such as presence of an adhesion contract and objectively reasonable expectations of the aggrieved party, *see Wagner,* 786 P.2d at 767, may occur in contractual relationships outside of the insurance context. *See, e.g., Schurtz v. BMW of North Am., Inc.,* 814 P.2d 1108 (Utah 1991) (addressing dispute involving a form warranty for new automobile). In comparison, the existing equitable doctrines, such as waiver, estoppel, and unconscionability, apply to any contractual relationship regardless of context so long as warranted by the facts.

thorizing and governing insurance contract clauses and setting forth acceptable methods by which various clauses can be modified by the parties). Adoption of the reasonable expectations doctrine poses a much greater risk of broadly undermining these legislative goals than our continued use of existing equitable doctrines applied on a case-by-case basis.

Allen's final argument is that the contested exclusion is ambiguous. Although her brief is unclear as to the consequences of the alleged ambiguity, we assume that she wants the court to find that the exclusion is ambiguous and therefore enforce her reasonable expectations. So construed, Allen's final argument comports with a version of the reasonable expectations doctrine apparently recognized in several states. *See, e.g., Richards v. Hanover Ins. Co.*, 250 Ga. 613, 299 S.E.2d 561, 563 (1983) (applying rule that when insurance contract is ambiguous, it is "to be read in accordance with the reasonable expectations of the insured"); *Simon v. Continental Ins. Co.*, 724 S.W.2d 210, 213 (Ky.1987) (applying rule that insured's reasonable expectations are to be enforced unless disputed exclusion is conspicuous and clear). Under this theory, ambiguous provisions are interpreted to effectuate the reasonable expectations of the insured. Henderson at 826.

It is doubtful whether application of this version of the reasonable expectations doctrine can be distinguished from, or adds anything to, the application of the canon of construction resolving ambiguities against the drafter and reforming the contract accordingly. *See generally* Henderson at 827 ("[D]ecisions that use [reasonable expectations] solely to construe policy language do not support a new principle at all, but fall within the time-honored canon of construing ambiguities against the drafter of the contract...."); Ware at 1469 (same conclusion). However, we have no occasion to consider this issue further because the disputed exclusion is not ambiguous.

■ Allen's policy states that coverage is excluded for "any Insured under ... the definition of 'Insured.'" "Insured" is defined as "if residents of the Named Insured's household, his spouse, the relatives of either, and any other person under the age of twenty-one in the care of any Insured." The exclusion clearly applies to the Allens' two-year-old son.

In sum, we reject the various versions of the reasonable expectations doctrine advanced by Allen.[18] Our existing equitable doctrines have not been shown to be inadequate to the task of protecting insureds from overreaching insurers. Accordingly, we affirm the summary judgment in favor of Prudential.

HALL, C.J., and HOWE, Associate C.J., concur.

STEWART, Justice (concurring in the result):

I concur in the conclusion that the household exclusion contained in plaintiff's homeowner's insurance policy is valid. However, I do not join the majority's wholesale disavowal of the reasonable expectations doctrine. In my view, this Court should decide only whether the doctrine should be applied on the facts of this case. Anything beyond that is dicta and not binding in any

**18.** Justice Stewart's concurrence criticizes this opinion for all manner of sins. In order to provide the target for his attack, Justice Stewart imputes to the majority motives that it does not have and mischaracterizes a number of statements made in this opinion. The best source as to what this opinion stands for is the opinion itself.

It is worth noting that the rather truncated version of the reasonable expectations doctrine described in Justice Stewart's opinion, a version that would preclude Allen from taking her case to a jury, bears little resemblance to any of the versions of this doctrine argued for by plaintiff or by Justice Durham in her dissent. Indeed, the narrow doctrine described by Justice Stewart, under which Allen's factual allegations are not sufficient to raise a jury question as to the reasonableness of her expectations, amounts to little more than a variation on the traditional equitable doctrines by which this court has proceeded interstitially to remedy overreaching by insurers and others using standard form con-

other case.[1]

The facts of this case present nothing more than plaintiff's assertion that she had a subjective, uncommunicated, and otherwise unsupported expectation of coverage under the homeowner's insurance policy. Whether the reasonable expectations doctrine should be applied in some future case on different facts cannot be legitimately determined in this case, and the majority's attempt to foreclose reliance on that doctrine is simply inappropriate.

To reach the issue of the general validity of the reasonable expectations doctrine, the majority "assumes" that plaintiff "raised factual issues as to whether she in fact expected the household exclusion to be contained in the Prudential policy and whether that expectation was reasonable." Plaintiff did raise an issue of fact as to her *subjective* expectation of coverage; however, she established no objective basis to show that her expectation was *reasonable.* Nevertheless, the majority "assumes" that it was reasonable.

Under the reasonable expectations doctrine, the reasonableness of plaintiff's expectations must be established by objective criteria. *See generally Restatement (Second) of Contracts* § 211 (1979); Robert E. Keeton, *Insurance Law Rights at Variance with Policy Provisions*, 83 Harv. L.Rev. 961, 967 (1970). It is generally recognized that a mere subjective expectation of coverage is not enough because "most insureds develop a 'reasonable expectation' that every loss will be covered by their policy." *Darner Motor Sales, Inc. v. Universal Underwriters*, 140 Ariz. 383, 682 P.2d 388, 395 (1984). The expectation must be established "by something more than the fervent hope usually engendered by

loss." *Id.* Yet, a fervent hope is all that there is in this case. Plaintiff essentially asks this Court to rewrite her policy to allow for increased coverage simply because she subjectively expected coverage.

### I.

The purpose and nature of homeowner's insurance, coupled with Mr. Allen's deposition testimony regarding his intent and the circumstances surrounding the purchase of his homeowner's policy, clearly show that plaintiff had no reasonable basis for her expectation of coverage. As a general rule, the purpose of homeowner's insurance is to protect the owner from property loss due to a disaster, such as fire, and from liability if someone is injured on the premises. Homeowner's insurance does not ordinarily provide bodily injury coverage for members of the insured's household. That coverage is typically obtained under a medical and health insurance policy. The insurance company certainly considers the household exclusion when calculating its risk under a homeowner's policy. The result is a relatively low premium when compared with premiums for higher risk coverage, such as medical and health insurance. If an insurer provided bodily injury coverage in a homeowner's policy for those living on the insured premises, the likelihood of covered injuries would substantially increase and the insurer would assess a higher premium based on that increased risk. *See, e.g., Farm Bureau Mut. Ins. Co. v. Sandbulte*, 302 N.W.2d 104, 113 (Iowa 1981).

The specific facts of this case demonstrate that plaintiff's expectation lacked a reasonable basis. It is undisputed that

---

tracts to the detriment of insureds and consumers generally.

1. Justice Zimmerman's ambiguous retrenchment in footnote 18 hardly settles the difficulties that arise from the broad scope of his opinion. It is, of course, fundamental that the applicability of legal rules should be applied on a case-by-case basis. Footnote 18, however, states that "the best source as to what this opinion stands for is the opinion itself." Whatever the majority opinion stands for, the scope of its holding and the scope of its dicta are decidedly

*not* determined within its four corners. Indeed, Justice Zimmerman compounds the departure from legitimate judicial process by insisting that given available equitable remedies, there is no proven need to adopt the reasonable expectations doctrine in Utah at this time. As will be shown in the text, this case stands only for the proposition that on these facts—not what the majority incorrectly assumes to be the facts—no version of the reasonable expectations doctrine is applicable.

Mrs. Allen never spoke with the Prudential agent. She left the purchase of the insurance entirely up to her husband. In his deposition, Mr. Allen testified regarding the type of coverage he sought in applying for homeowner's insurance:

> Well, I just wanted to make sure that my—that my home was covered, you know, and the standard policy with all of the fire and the theft and the—all those kinds of things that can happen to a house, and then I had—I had to ask them to make sure that I was covered for my tools and equipment and—because that's how I was earning my income, and I wanted liability coverage so that I wouldn't get sued and those kinds of things, you know, if we had an accident. And so, anyway, that was basically what we had discussed, and the amounts that—he had me kind of make a list for him of our household items so we would know how much money to cover for that.

Nothing in this statement even remotely suggests that the Allens sought to procure coverage for themselves and their children. Indeed, the statement indicates only that the Allens sought a typical homeowner's policy which would provide coverage for property damage, theft, and liability in the event they were sued.

Plaintiff argues that the agent should have known of her expectation of coverage when Mr. Allen contacted him to increase liability coverage after the Allens purchased a trampoline. Plaintiff states that Mr. Allen told the agent "to make sure that anyone who got hurt on the trampoline would be covered" and that "he was really concerned about the trampoline and that he wanted to make sure he had full coverage under the policy to cover such an eventuality." Even though Mr. Allen testified in deposition that it was his intention to get coverage for himself and his family in the event they were hurt on the trampoline, he also testified that he did not express that intent to the agent because he "just assumed that that was for anybody that got hurt on [his] property." Mr. Allen points to no specific words or conduct on the part of himself or the agent that would lead to the inference that the agent knew or should have known of the Allens' expectation. On the contrary, Mr. Allen's deposition testimony regarding the events leading up to the changes in coverage clearly indicate that he was concerned with being sued by third parties, not with coverage for his family:

> I was really concerned because we had heard horror stories of people getting sued because of their trampolines and so I called Russ and asked him if we could—if we could increase my coverage to make sure that if anyone got hurt on the trampoline, they would be covered, and he recommended that we—that we build a fence around the yard, which I did.... And we increased my insurance so that if anybody got hurt on my property, we were covered....

The agent's recommendation to build the fence and the Allen's compliance also indicate a concern only for liability for nonfamily members injured on the trampoline. In addition, the record indicates that plaintiff had health and medical insurance at the time of the accident and that she filed a claim against that insurance.

In short, plaintiff failed to raise a material issue of fact with respect to the reasonableness of her expectation of coverage that would establish a foundation for application of the reasonable expectations doctrine, however broadly that doctrine might be construed. Thus, in my view, the discussion in the majority and dissenting opinions regarding the general validity of the reasonable expectations doctrine is irrelevant.[2]

---

**2.** Justice Zimmerman argues in footnote 7 that I do not take "the facts in a light most favorable to the nonmoving party, as we are bound to do [citations omitted]. Rather, Justice Stewart weighs the evidence and makes a finding of fact that Allen's expectations could not be reasonable." Justice Zimmerman is flatly incorrect. There is no fact asserted in this case, even taking those facts in the light most favorable to plaintiff, that supports an inference that her expectations were objectively reasonable, and Justice Zimmerman cites none. Thus, Justice Zimmerman erroneously proceeds on an inappropriate assumption in an effort to reject the reasonable expectations doctrine, without even attempting to define it. His failure to acknowl-

Addressing the Court's dicta, I note that the majority does not define the doctrine.[3] Although the majority recognizes that the doctrine has a number of different formulations, it describes the doctrine in only the most general terms, leaving the reader with the impression that the reasonable expectations doctrine would allow courts to engage in wholesale rewriting of insurance policies simply because an insured expected coverage. This, presumably, is the basis for the majority's concern that the doctrine would unduly interfere with the parties' freedom to contract. The majority's position essentially states that the reasonable expectations doctrine is an aberration from traditional principles of contract law. It may be something of an extension, but it is not an aberration.

In reality, the reasonable expectations doctrine falls within long-accepted and well-settled principles of contract law, as evidenced by its adoption in *Restatement (Second) of Contracts* § 211 (1979).[4] The *Restatement*'s formulation of the doctrine is simply a rule of construction that allows a fact finder to look at the totality of the circumstances in determining the intent of the parties, rather than being strictly confined to the four corners of a standardized agreement. *See, e.g., Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.,* 140 Ariz. 383, 682 P.2d 388, 397 (1984). In other words, the doctrine modifies the parol evidence rule and allows parties to present proof that their true intent was not accurately reflected in the written contract. This is particularly necessary and appropriate in the case of standardized adhesion contracts. *See Restatement (Second) of Contracts* § 211, cmt. a.

The *Restatement*'s view of the reasonable expectations doctrine acknowledges the reality that in a standardized or form contract one necessarily relies on the party supplying the contract and that party's good faith that the agreement will reflect the true intent of the transaction. When standardized preprinted forms contain terms not contemplated by the parties, those terms should not be given effect. As a rule of construction, the doctrine does not interfere with freedom of contract, but merely ensures that the parties' intent be effectuated.[5]

edge that both Section 211 of the *Restatement* and Professor Keeton, see my discussion *infra*, require more than a subjective expectation to establish the reasonable expectations doctrine explains why this simple case has evolved into an unnecessarily protracted one.

3. The dissent argues policy considerations in support of the reasonable expectations doctrine. But it, like the majority, fails to define the doctrine.

4. That section, which applies to standardized or form agreements, reads:
(1) Except as stated in Subsection (3), where a party to an agreement signs or otherwise manifests assent to a writing and has reason to believe that like writings are regularly used to embody terms of agreements of the same type, he adopts the writing as an integrated agreement with respect to the terms included in the writing.
(2) Such a writing is interpreted wherever reasonable as treating alike all those similarly situated, without regard to their knowledge or understanding of the standard terms of the writing.
(3) Where the other party has reason to believe that the party manifesting such assent would not do so if he knew that the writing contained a particular term, the term is not part of the agreement.
Comment (b) points out that parties regularly using standardized agreements ordinarily do not expect customers to "understand or even to read the standard terms." Customers "trust to the good faith of the party using the form and to the tacit representation that like terms are being accepted regularly by others similarly situated."

5. In response to this opinion, Justice Zimmerman states that the *Restatement* version bears little resemblance to the "ill-defined and sweeping doctrine argued for by Allen." This version, however, formed the basis of the Utah Court of Appeals' opinion in *Wagner v. Farmers Insurance Exchange,* 786 P.2d 763 (Utah Ct.App. 1990). As noted by the majority, Allen argued that the trial court erred in not applying the variant of the reasonable expectations doctrine discussed in *Wagner.* Thus, the *Restatement* version was advanced by plaintiff.

Nevertheless, Justice Zimmerman's assertion that this version is different from that argued by Allen and by Justice Durham only supports my contention that the majority goes too far in its general rejection of the doctrine. Given the many different versions, it is impossible, on these facts, to determine the appropriate application of the doctrine on other facts.

Furthermore, the reasonable expectations doctrine may be essential to reaching a fair result in certain cases. It is not appropriate for this Court on this record to foreclose the application of some version of the doctrine in a later case on other facts. For example, in *Tonkovic v. State Farm Mutual Automobile Insurance Co.*, 513 Pa. 445, 521 A.2d 920 (1987), the insured, in completing an application for disability insurance, specifically requested a classification that would provide coverage whether or not he was eligible for workers' compensation benefits. The insurer, after receiving the insured's premium, changed the insured's classification to exclude coverage when workers' compensation was available. Although the insured received a copy of the policy, he did not read it. After the insured was injured on the job, the insurer denied benefits because of the availability of workers' compensation. The Pennsylvania Supreme Court held that the insured was entitled to coverage because

> when the insurer elects to issue a policy differing from what the insured requested and paid for, there is clearly a duty to advise the insured of the changes so made. The burden is not on the insured to read the policy to discover such changes, or not read it at his peril.

*Tonkovic*, 521 A.2d at 925. The court emphasized that the reasonable expectations of the insured were the focal point of the insurance transaction and that such expectations are "in large measure created by the insurance industry itself." *Id.* at 926.

None of the existing equitable doctrines mentioned by the majority would be directly applicable in the *Tonkovic* case. Estoppel is at best problematic because the agent did not induce reliance by his representations. Likewise, waiver, defined as the voluntary and intentional relinquishment of a known right, would not apply. Nor was the exclusion in *Tonkovic* unconscionable. A breach of an implied duty of good faith and fair dealing generally arises in other contexts; and primarily deals with the insurer's refusal to settle a claim mandated by the policy. Finally, the exclusion in *Tonkovic* was unambiguous.

It is possible that we will one day have to decide a case such as *Tonkovic* that does not fit within traditional equitable doctrines. The availability of these doctrines is simply not a valid basis in my view for a wholesale rejection of the reasonable expectations doctrine.

## II.

The majority argues in broad dicta that the adoption of the reasonable expectations doctrine as formulated in *Wagner v. Farmer's Insurance Exchange*, 786 P.2d 763 (Utah Ct.App.1990), and thus the *Restatement*, would modify legislatively expressed public policy regarding regulation of the insurance industry. The majority also assumes that legislative and executive regulation of the insurance industry limits judicial authority to engage in the modification of principles common to insurance contracts. With both of these statements, I emphatically, but respectfully, disagree.

In support of its argument, the majority cites Utah Code Ann. § 31A–21–201(2)(a) (1991), which provides that the insurance commissioner may "disapprove" a form if it is inequitable, and concludes that "the validity of preprinted insurance contracts is premised on regulatory approval...." With deference, I submit that it is extremely farfetched for the majority to argue that pro forma administrative approval of thousands upon thousands of pages of forms somehow deprives the courts of the power to use the common law process of developing principles of fairness, justice, and equity.

The insurance commissioner neither writes nor, more importantly, approves the forms. The fact that the commissioner has the power to disapprove a form in certain circumstances does not indicate "regulatory approval" of forms not disapproved. The majority's implication that the commissioner's review will guarantee fairness in the terms of a contract is misguided and wrong. Furthermore, much injustice and unfairness in insurance transactions may occur, irrespective of the written language of the contracts.

Finally, I submit that the majority misinterprets our previous decisions. The majority specifically refers to three of our cases, stating, "Taken as a whole, these cases show our unwillingness to alter fundamentally the terms of insurance policies in the absence of legislative direction." Our cases simply do not say that. In many situations, the real issue in insurance contracts is determining what the terms of the policy are. The majority assumes that the reasonable expectations doctrine would fundamentally alter the terms of insurance policies. As noted above, however, the *Restatement* version of the doctrine merely allows courts to determine contract terms more realistically than they could by relying only on a written document, whose drafters may have intentionally obscured the policy's language in a thicket of verbiage and on whose meaning even appellate judges may disagree.

The cases cited do not support the majority's assertion that this Court is "uneasy with the notion of a reasonable expectations doctrine." *General Motors Acceptance Corp. v. Martinez*, 668 P.2d 498 (Utah 1983), involved a provision in a credit life and disability insurance agreement excluding coverage. We invalidated the provision because the insured had never received a copy of the policy as was required by statute. The next case, *Farmers Insurance Exchange v. Call*, 712 P.2d 231 (Utah 1985), invalidated a household exclusion in an automobile liability insurance policy to the extent that it conflicted with the minimum coverage requirements of the Utah Automobile No-Fault Insurance Act. The insurer in *Call*, like the insurer in *Martinez*, failed to deliver written notice of the policy or exclusion to the insured. We stated, "Without disclosure, the household exclusion clause fails to 'honor the reasonable expectations' of the purchaser, rendering the exclusion clause invalid as to the entire policy limits." *Id.* at 237. In the third case, *State Farm Mutual Automobile Insurance Co. v. Mastbaum*, 748 P.2d 1042 (Utah 1987), we held that a household exclusion in an automobile liability insurance agreement was valid to the extent coverage remained above the minimum required by statute. We expressly declined in that case to address the implications of the reasonable expectations doctrine because it was not adequately presented on appeal. *Id.* at 1044 (Zimmerman, J., concurring).

. Although the majority insists that we should always defer to legislative policy in construing insurance provisions, it never defines the legislative policy to which we should defer. The majority appears to be most concerned with freedom of contract. However, Utah Code Ann. § 31A–1–102 (1991) lists eleven other policies underlying the Insurance Code, including "to ensure that policyholders, claimants, and insurers are treated fairly and equitably." § 31A–1–102(2).

For the foregoing reasons, I concur in the validity of the household exclusion in this case, but I reject the Court's far-flung and ill-advised dicta regarding the reasonable expectations doctrine. The doctrine remains to be applied on a case-by-case basis.

DURHAM, Justice (dissenting):

I dissent. I would hold that the doctrine of reasonable expectations as applied to insurance contracts is viable in Utah. Justice Zimmerman's review of the history and rationale for the doctrine is accurate as far as it goes, but his analysis and conclusions are wrong. His opinion appears to rely on an anachronistic and unrealistic notion of freedom of contract and a misplaced view that the legislative and executive branches of government have somehow "occupied" the field of insurance regulation in a manner that makes court development of applicable contract principles illegitimate. The majority also mischaracterizes the current status of the reasonable expectations doctrine, unduly limiting its usefulness as a tool of contract construction.

The majority opinion cites two recent commentaries on the doctrine of reasonable expectations as support for the proposition that "after more than twenty years ... there is still great uncertainty as to the theoretical underpinnings of the doctrine, its scope, and the details of its application."

Significantly, however, one of the commentators so cited goes on to observe:

> Such ambivalence is inherent in the common law where all "doctrines" were once exceptions or accretions to other doctrines that have emerged to take on lives of their own. Doctrines do not generally spring full-blown from any one case, or for that matter from a single law review article, but must await development by means of the fortuities of litigation.
>
> ....
>
> Although the form of the doctrine of reasonable expectations may not be fully fixed yet in all jurisdictions, and may never be, a doctrinal core has been identified by some of the courts that have viewed the doctrine as creating rights at variance with unambiguous policy language. As a consequence, one may predict with considerable confidence that courts in the remaining jurisdictions will recognize these developments and that any confusion over the nature of the doctrine itself will rapidly dissipate.

Roger C. Henderson, *The Doctrine of Reasonable Expectations in Insurance Law After Two Decades,* 51 Ohio St.L.J. 823, 838 (1990).

The other concludes:

> From a theoretical perspective, the reasonable expectations doctrine represents a decided advance over both strict contract analysis and the ambiguity principle. It has the advantage of honesty because it takes the insurance transaction as it is and not as it is imagined to be. It also holds the promise of fairness and, somewhat less securely, the promise of greater clarity and precision....
>
> ... [A] thorough reconsideration of the reasonable expectations doctrine shows that it can be effective.

Mark C. Rahdert, *Reasonable Expectations Reconsidered,* 18 Conn.L.Rev. 323, 392 (1986) [hereinafter Rahdert].

Earlier in the same article, Professor Rahdert offers the judgment that

> the difficulties with the reasonable expectations concept, though real, do not outweigh its usefulness to the point that

the principle should be abandoned. Returning to the regime of document-based "interpretation" of the insurance policy through manipulation of the ambiguity principle certainly affords no better promise of consistency or precision. As the legal realists demonstrated over a generation ago, such a retreat displays an ostrich-like unwillingness to confront head on the realities of the adhesion insurance contract.

*Id.* at 373.

As the commentators indicate, traditional notions of freedom of contract do not reflect the realities of contracting in today's marketplace, particularly in the marketplace of insurance contracts. In fact, the majority of recent scholarly commentary on the doctrine of reasonable expectations is favorable. A notable exception, which appears to have influenced the majority opinion in this case, is Stephen J. Ware's *A Critique of the Reasonable Expectations Doctrine,* 56 U.Chi.L.Rev. 1461 (1989) [hereinafter Ware]. That article reflects the "law and economics" approach to common law, wherein the principles of freedom of contract and economic efficiency are enshrined above all other values. The author's discussion of freedom of contract depends on a highly traditional and rigorously individualistic understanding of contract law that is inconsistent with modern practice in the transaction of insurance contracts. For example, the article cites with approval a 1947 articulation of this view: "A man must indeed read what he signs, and he is charged if he does not...." Ware at 1488 (quoting *Gaunt v. John Hancock Mut. Life Ins. Co.,* 160 F.2d 599, 602 (2d Cir.1947)). It takes little experience to realize that most insurance purchasers do not read their insurance policies and those who do often cannot understand them. Thus, such inflexible and outdated notions may ultimately frustrate the intent of the parties.

Times have changed since the late nineteenth and early twentieth centuries, when individualism and competition were the dominant values in American culture and business:

The expression of this attitude in contracts law was that every contract was an outcome of a struggle between the parties in which each took every possible advantage of the other. If one party bound himself to terms he never read or did not understand, that was his choice, and the law, within broad limits, did nothing to excuse him from the risks he had supposedly voluntarily assumed.

W. David Slawson, *The New Meaning of Contract: The Transformation of Contracts Law by Standard Forms*, 46 U.Pitt.L.Rev. 21, 28 (1984). Today, however, the pace of life, the volume of contracting required for ordinary living, the complexity of products, and the legal implications of contracts make it necessary for people to take almost all of their contracts on trust; society has become more interdependent. The combination of the changed conditions of contracting has resulted in contracts with a larger "social," rather than purely individualistic, meaning.

Many scholars, as well as numerous courts, have struggled with the need to adapt traditional notions of contract to modern economic and social realities. In a thoughtful article on the "new meaning of contract," Professor David Slawson argues, "The meaning of contract is undergoing a fundamental change[,] . . . primarily because of certain changes in our society." *Id.* at 23. Slawson's article details those critical social changes—the changed conditions of contracting, the decline of individualism, the growth of bureaucracy in commercial transactions, and what the author describes as "the common law working itself pure." *Id.* at 29. As a result of these changes, the basic meaning of contract has changed.

The old meaning of contract centered on evidence of the parties' mutual assent (their conduct, writings, oral statements, etc., indicating their intent to be bound). Conversely, the new meaning of contract focuses on the parties' reasonable expectations. These expectations may arise from any source. Under the new meaning, a contract may consist of more than the parties' manifestations of mutual assent. In fact, given the multiplicity of form contracts so pervasive in today's society, in many cases manifestations of mutual assent are not included in the contract at all. Instead, the manifestations of mutual assent merely express the parties' intent to be bound to a few key terms (e.g., price and date), but do not affect the contents of the contract. *See id.* at 23.

The reason for such essential shifts in the nature of contracts can be attributed to dramatic changes in the conditions under which contracts are transacted. Briefly summarized, Slawson outlines how conditions have changed over the last half century as follows: First, businesses, largely because of size and volume, have found it efficient and profitable to use standard forms. Second, "modern living requires the use of many products, virtually all of which have to be obtained by a contract of some kind. People today therefore have to contract frequently, not uncommonly several times a day." *Id.* at 24. Third, new statutes and the "ever-quickening accumulation of the common law" have changed the number and complexity of the legal implications of every contract. *Id.* at 25. Fourth, the increased use of mass commercial communications has transformed the ways in which people acquire expectations about the products they buy and the commercial transactions in which they engage.

The impact of these changed conditions is that businesses can exploit the second and third conditions by drafting standard form contracts any way they like to best serve their interests. Consequently, only consumers really transact blindly. Further, "[t]he situation is aggravated by the fact that consumers typically come to transactions with their expectations about the product already largely formed [by mass commercial communications]." *Id.* at 26.

Finally, Slawson argues that because of the inherent contradiction in logic contained in the old meaning, "[t]he new meaning [of contract] would have emerged eventually even if the societal conditions mentioned had not changed and the extreme

individualism of the turn of the century had not declined":

> Under the old meaning, a contract is the parties' manifestations of mutual assent, but, at the same time, it is supposed to fulfill their reasonable expectations. This constitutes a contradiction when the manifestations of mutual assent are deemed to be writings that one party was not reasonably expected to understand or sometimes even to read. This contradiction cannot exist under the new meaning, because under it the contract *is* the reasonable expectations.

*Id.* at 29 (emphasis in original). The transition from old to new meaning is the process he describes as the "common law working itself pure."

Slawson's theory of the new meaning of contract is broader than the issue we are required to resolve in this case. I have described it at length because I agree with him that the doctrine of reasonable expectations is "indistinguishable in effect from the new meaning of contract, so long as the standard forms are insurance policies." *Id.* at 52. Slawson's work thus provides strong historical, practical, and intellectual support for the adoption of the doctrine.

Justice Zimmerman's opinion urges, by contrast, an "interstitial" approach to solving the problems that standard form insurance contracts create. He suggests that we rely on estoppel, waiver, unconscionability, breach of the implied duty of good faith and fair dealing, and the rule construing ambiguous language against the drafter. These doctrines (along with several possibilities not mentioned by Justice Zimmerman, including the doctrines of implied condition, excuse of condition, mutual mistake, frustration of purpose, and impossibility or impracticability of performance) are all techniques courts use to broaden the inquiry to include the reasonable expectations of the parties and the meaning of the contract beyond its explicit terms:

> All these doctrines have been opposed in their development by the principle of "freedom of contract." ... Using the principle [of freedom of contract] as a justification for allowing one party to impose whatever terms it likes, even when the other party was not reasonably expected to read or understand those terms, is to apply the name "freedom" to what is essentially a license to defraud or, at least, to mislead. Contracting should be accorded the protections associated with freedom only when the parties engage in an honest effort to express what they both reasonably expect.

*Id.* at 55. Furthermore, each of the foregoing doctrines is limited in its capacity to resolve recurring problems with standard form insurance contracts. Unconscionability, for example, requires some form of deceptiveness or sharp dealing; consequently, the doctrine is used only in extraordinary cases. The one-sidedness and unfair advantage attendant upon adhesion contracting "can be completely legitimate and stem[ ] from perfectly natural and moral self-interest"; it is thus often entirely beyond the reach of unconscionability analysis. Rahdert at 378 (citing Leff, *Unconscionability and the Code—The Emperor's New Clause,* 115 U.Pa.L.Rev. 485 (1967)).

In addition to the inherent problems associated with adhesion contracts, insurance contracts pose special problems. The adhesive nature of the insurance transaction is only the threshold consideration. The risks of one-sidedness an insurance contract creates are enhanced by a number of factors: (1) Insurance is an abstract "product" (really a future service) that is not well understood by the average consumer; (2) the service purchased is only a contingent one, to be provided in the future if an unlikely event occurs; (3) insurance is vital, often required by law, and loss events are potentially catastrophic; (4) unlike other contracts, insurance contracts do not delineate clearly between the portions of the contract providing for goods or services and clauses limiting liability if the contract does not go as planned. Distribution of risk of loss is the entire bargain. *See* Rahdert at 338–41.

These factors make insurance contracts peculiar but necessary. Most consumers find it necessary to purchase some form of insurance. Unfortunately, very few are

equipped to fully understand the implications of a particular policy, especially those provisions relating to exclusion of coverage. The daunting task of comprehending an insurance policy discourages most of us from reading our policies until a loss forces us to. *See* Rahdert at 341.

Nevertheless, Justice Zimmerman suggests that because insurance is a regulated industry and the legislature has undertaken to exercise some control over the contents of insurance policies and contract language, the courts ought not to engage in common law regulation of fairness, at least by means of the doctrine of reasonable expectations. Such a broad restriction on the courts' powers in this context is unwarranted. The mere existence of a regulatory framework is likely insufficient to ensure fairness. As Professor Rahdert has noted:

> Most observers have agreed ... that administrative regulation generally deserves only middling marks in terms of combatting insurer fine print. State legislatures, too, have entered the field by mandating policy provisions in certain common insurance policies and by limiting the effect of some of the most potentially abusive provisions.... But legislatures can only be counted on for sporadic efforts and are subject to real pressures from insurance industry and lawyer lobbies that have little desire to promote consumer-oriented reforms....

In sum, there remains plenty of reason to believe that adhesion, standardization, and the special features that make insurance a unique sort of financial service will create a substantial risk of some underwriter overreaching in a significant number of cases. Courts, whether they be armed with the old-fashioned ambiguity principle or some more modern and potent jurisprudential weapon, stand as the last and perhaps the most effective defenders of consumers....

Rahdert at 341-42. Justice Zimmerman's opinion, of course, acknowledges that traditional contract principles (like waiver and estoppel) apply to our interpretation of insurance contracts. It would therefore appear that he agrees that the courts have a role to play, the issue being how much of a role and using what tools. Eliminating such a potentially effective and necessary tool as the reasonable expectations doctrine is a mistake and unwarranted by our case law or policy considerations.

Although I acknowledge certain difficulties with the reasonable expectations doctrine, I view such problems as grounds for refinement of its content and care in its application, not for exclusion of its use. Professor Rahdert has proposed a sound model for judicial evaluation of reasonable expectations claims. Rahdert at 374-92. He suggests that courts adopt a two-tiered reasonable expectations formula. Under what he calls "weak form" reasonable expectations review, courts would enforce a policy provision if "(1) the insurer can articulate a legitimate purpose for the provision, one that pertains to defining the 'landscape of risk' covered by the insurance policy; and (2) the provision is stated in terms clear enough to communicate its underwriting purpose to the average purchaser" (taking account of the insured's lack of expertise and purpose of purchasing the insurance). This form of review would apply to all insurance transactions and policy terms, regardless of their ambiguity. *See* Rahdert at 381-82; *see also Weedo v. Stone-E-Brick, Inc.*, 81 N.J. 233, 405 A.2d 788 (1979) (using consideration of underwriting purposes as a factor in reasonable expectations analysis).

Courts would undertake a "strong form" review when indications of a "naked preference" are evident in the transaction.[1] A

---

**1.** Rahdert derives his forms of judicial review ("strong" and "weak") from Keeton's early formulation of the reasonable expectations doctrine: "The objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those ex-

pectations." Rahdert at 334 (quoting Keeton, *Insurance Law Rights at Variance with Policy Provisions,* 83 Harv.L.Rev. 961, 967 (1970)). Rahdert expounds on the Keeton formula as follows:

> Read in one way, by emphasizing the contrast between "expectations" and "policy provisions," the Keeton formula suggests that an

naked preference is a policy provision that arbitrarily serves the insurer's interest without furthering a legitimate underwriting purpose. Where a provision reasonably furthers a legitimate purpose of defining, classifying, and allotting risks, it will generally be enforceable. Conversely, where a provision merely furthers the "naked" purpose of providing the insurer a defense to coverage without serving a legitimate underwriting function, it will be subject to close scrutiny. *See* Rahdert at 379.

Rahdert identifies at least five factors that indicate the presence of a naked preference which should trigger strong-form review: (1) marketing practices using implicit or explicit promises of coverage substantially broader than those in the policy provisions; (2) the characteristics (i.e., individual, small business, large corporation) and attendant sophistication and expertise of the insured; (3) structure and format of the policy (certain formats and types of policy provisions may be more susceptible to use for disguising naked preferences than others); (4) comparison of risks;[2] and

(5) the presence of certain categories of insurance (e.g., automobile liability coverage) in which the public has such a strong interest that naked preferences pose a significant danger, even though they may not necessarily be more likely to occur.[3]

The foregoing proposal, which I would adopt, is that insurers in every case be held to the minimum standards of "weak form review." Once those standards are satisfied, courts should proceed to determine whether any of the "strong form factors" require more strict review. "In this second stage of analysis, the court should balance the force of these strong-form factors against the underwriter's articulated rationale for excluding the risk in question." Rahdert at 386. For a detailed illustration of Professor Rahdert's two-tiered analysis in application, see Rahdert at 388–92.

Thus, the reasonable expectations doctrine would operate as a "balancing test," requiring equilibrium between the risk of insurer overreaching and the advantages (especially cost, efficiency, and predictability) of standardization and form contract-

insured can have reasonable expectations of coverage that arise from some source *other* than the policy language itself, and that such an extrinsic expectation can be powerful enough to override any policy provisions no matter how clear....

The contrast between "reasonable expectations" and "painstaking study of policy provisions" also can be read in an entirely different and considerably less radical way, with heavy emphasis on "painstaking." Approached from this direction, the Keeton formula is more acceptable to the traditional contract mind. It means that an expectation formed from a cursory reading of the policy, though technically wrong, may yet be reasonable, and if so should be honored; but that expectations derived from sources other than at least a cursory review of the policy language are not reasonable, and should not be honored in the face of unambiguous contrary policy language.

The difference between these two approaches is striking. The former, "stronger" reading would confer on the courts substantial new powers to set the contours of coverage under various kinds of insurance. It would do so by reducing the power of the insurer's written word to control the scope of the arrangement, and by substituting the dynamics of the transaction for the language of the policy as the source of the terms of the bargain. The latter, "weaker" reading would

do little more than generate a new variant of the ambiguity principle. Like the ambiguity principle, it would absolve the insured of the obligation of expertise by permitting the insured's circumstances and lack of sophistication to be taken into account. Beyond that, but only in cases where the policy provisions are sufficiently unclear that a cursory reading might create a false impression, it would also relieve the insured of the obligation of painstaking care. And it would provide the beginnings of a method for filling ambiguous gaps in policy language by referring the courts to what the ordinary insured would anticipate the scope of his or her protection to be. But it would leave the policy provisions in place as the controlling code for resolving disputes over coverage.
Rahdert at 335–36.

**2.** "Courts should evaluate the types of risks included and excluded from the policy, both in relation to each other and to the insured's purpose in purchasing the insurance in question." Rahdert at 385.

**3.** "Thus, where a court discerns from legislative and other sources a strong public policy favoring coverage, the court should engage in a more detailed search for insurer preferences that would undercut the jurisdiction's public goals." Rahdert at 386.

ing. In conducting such balancing, we should look to insurer conduct as well as to the insured's state of mind in evaluating the "reasonableness" portion of reasonable expectations. *See* Rahdert at 376.

The special role insurance plays in society and the public interest it implicates justify such an approach. Insurance protection is vital, not only for consumers, but also for the state, which depends on the insurance industry to supply "a free enterprise alternative to government-funded social compensation." Rahdert at 377. Furthermore, the insurance industry's antitrust exemption has fostered a cartel-like structure in policy drafting that encourages mass standardization. This structure provides the industry with an exceptional level of "private lawmaking power." Rahdert at 377 (quoting W. David Slawson, *Standard Form Contracts and Democratic Control of Lawmaking Power*, 84 Harv. L.Rev. 529, 530 (1971)). Such quasi-public lawmaking power should be subject to judicial review. Legislative and administrative regulation alone is inadequate. To safeguard the public interest in each case, judicial regulation of the insurance industry's private laws (i.e., its policy provisions) is essential. *See* Rahdert at 377. Thus, the insurance industry's unique law-making role necessitates the type of judicial inquiry Rahdert suggests.

I think Rahdert's proposed "calculus" makes eminent sense, and I submit that this court could greatly enhance the development of the law in this area by undertaking the kind of thoughtful analysis he proposes. We would have to deal also with methodological problems, some of which Justice Zimmerman has identified in his opinion. Of particular concern are questions about whether the standard for reasonable expectations should be subjective or objective, whether the determination of the existence of reasonable expectations involves questions of fact or law, and the kind of evidence that is relevant to the questions. I believe that those questions are not impossible or even particularly difficult to solve. Many of the courts that have used the doctrine of reasonable expectations have addressed them, and numer-

ous commentators, have examined additional options. *See, e.g.,* Roger C. Henderson, *The Doctrine of Reasonable Expectations in Insurance Law After Two Decades*, 51 Ohio St. L.J. 823, 828–38 (1990), and cases cited therein.

In conclusion, I submit that Justice Zimmerman's "interstitial" approach has little to recommend itself, historically or theoretically. Either it will encourage the kind of "covert" decision making that has drawn criticism in insurance contract construction cases, or it will result in rigid application of contract principles that do not comport with the real world of insurance and that unfairly disadvantage consumers. *See* William A. Mayhew, *Reasonable Expectations: Seeking A Principled Application*, 13 Pepp.L.Rev. 267, 272 (1986) (noting that courts misapply concepts of waiver and estoppel, stretch to find ambiguities beyond a reasonable interpretation of policy language, and apply vague expressions of public policy to covertly decide insurance cases and camouflage true reasons for their decisions). The doctrine of reasonable expectations would avoid both dishonesty and unfairness, and I submit that there is more than enough evidence, experience, and theory to justify our adoption of it.