2012 UT 71

**Gayle M. BURNS and I.M.B., a minor child, Plaintiffs and Appellants,**

v.

**Michael J. ASTRUE, Commissioner of Social Security, Defendant and Appellee.**

**No. 20100435.**

Supreme Court of Utah.

Oct. 12, 2012.

---

William R. Hadley, Salt Lake City, for appellants.

Alexess D. Rea, Amy J. Oliver, Salt Lake City, for appellee.

Associate Chief Justice NEHRING, opinion of the Court:

## INTRODUCTION

¶ 1 In this case we answer a question of Utah law certified to us by the United States District Court for the District of Utah. The question is: "Is a signed agreement to donate preserved sperm to the donor's wife in the event of his death sufficient to constitute 'consent[ ] in a record' to being the 'parent' of a child conceived by artificial means after the donor's death under Utah intestacy law, Utah Code Ann. § 78B–15–707?" For the reasons we explain in this opinion, an agreement leaving preserved frozen semen to the deceased donor's wife does not, without more, confer on the donor the status of a parent for purposes of social security benefits.

## BACKGROUND

¶ 2 Approximately two and a half years after Michael and Gayle Burns were married, Mr. Burns was diagnosed with cancer. The prescribed treatment, chemotherapy and radiation, would most likely leave Mr. Burns sterile. Mr. Burns deposited samples of his semen for cryopreservation at the University of Utah School of Medicine, Division of Urology. Mr. Burns signed a Semen Storage Agreement (Agreement) that provided the semen samples would be legally transferred to his wife in the event of his death. Specifically, the storage agreement provided,

> In the event of the death of the donor the donor would like his vials of semen (initial one of the items below):
>
> a. Destroyed: [*Blank*]
>
> b. Maintained in storage for future donation to *Gayle Burns* (fill in name and relationship) who will assume all of the obligations and terms described in this contract *MB.*

The storage agreement was signed by Mr. and Mrs. Burns as well as a staff member from the University of Utah.

¶ 3 On March 24, 2001, while domiciled in Utah, Mr. Burns died of cancer-related complications. Two years later, Mrs. Burns used the cryopreserved semen for artificial insemi-

nation. Mrs. Burns gave birth to I.M.B. on December 23, 2003.

¶ 4 Mrs. Burns applied for two types of Social Security benefits: (1) mother's insurance benefits for herself and (2) child's insurance benefits on behalf of I.M.B. Both benefits were based on Mr. Burns's earnings. The Social Security Administration (SSA) denied Mrs. Burns's applications, and, upon reconsideration, denied them again. The SSA found that Mrs. Burns had not shown I.M.B. was Mr. Burns's "child" as defined by the Social Security Act. Mrs. Burns requested a hearing before an administrative law judge on the matter. After holding a hearing, the judge issued a decision reversing the SSA's previous determination and finding that Mrs. Burns was entitled to benefits.

¶ 5 While the administrative law judge's decision was pending, Mrs. Burns filed a petition for adjudication of paternity in the Third Judicial District Court of Utah. The district court judge adjudicated Mr. Burns to be the father of I.M.B.

¶ 6 Subsequently, the SSA's Appeals Council notified Mrs. Burns that it had found "good cause" to reopen her case based on errors in the administrative law judge's decision granting benefits. The Appeals Council concluded that Mrs. Burns was not entitled to benefits based on Mr. Burns's earnings record because they had not shown that I.M.B. was the "child" of Mr. Burns as defined in the Social Security Act. Mrs. Burns then filed an appeal in the United States District Court for the District of Utah. The federal district court certified the state law question to this court. We have jurisdiction under Utah Code section 78A–3–102(1).

## STANDARD OF REVIEW

■ ¶ 7 "On a certified question, we are not presented with a decision to affirm or reverse, and traditional standards of review do not apply."[1] Therefore, "[o]n certification, we answer the legal questions presented without resolving the underlying dispute."[2]

## ANALYSIS

■ ¶ 8 The Social Security Act provides benefits for a deceased wage earner's child.

> In determining whether an applicant is the child or parent of a fully or currently insured individual for purposes of this subchapter, the Commissioner of Social Security shall apply such law as would be applied in determining the devolution of intestate personal property by the courts of the State in which such insured individual is domiciled at the time such applicant files application, or, if such insured individual is dead, by the courts of the State in which he was domiciled at the time of his death....[3]

The federal court has specifically asked us to interpret one section of the Utah Uniform Parentage Act, Utah Code section 78B–15–707, which states, "If a spouse dies before placement of ... sperm ..., the deceased spouse is not a parent of the resulting child unless the deceased spouse consented in a record that if assisted reproduction were to occur after death, the deceased spouse would be a parent of the child."

¶ 9 It is clear from this statute that one's status as a biological father, a status that Mr. Burns held, is legally insufficient to confer on a biological father the status of "parent." Thus, we must take the analysis one step further, and determine whether the Semen Storage Agreement indicates Mr. Burns's consent to be a parent of a child born by the use of his cryopreserved semen.[4] Mrs.

---

**1.** *Whitney v. Div. of Juvenile Justice Servs.*, 2012 UT 12, ¶ 7, 274 P.3d 906 (internal quotation marks omitted).

**2.** *U.S. Fid. & Guar. Co. v. U.S. Sports Specialty Ass'n*, 2012 UT 3, ¶ 9, 270 P.3d 464 (internal quotation marks omitted).

**3.** 42 U.S.C. § 416(h)(2)(A). The U.S. Supreme Court has held that the statute's language requires the state law inquiry presented to us in this case. *Astrue v. Capato ex rel. B.N.C.*, —

U.S. ——, 132 S.Ct. 2021, 2026, 182 L.Ed.2d 887 (2012) (holding as valid the SSA's interpretation of the statute, in which "biological children [are entitled] to benefits only if they qualify for inheritance from the decedent under state intestacy law, or satisfy one of the statutory alternatives to that requirement").

**4.** It is undisputed that the Agreement constitutes a record. A record is defined in Utah Code section 78B–15–102(22) as "information that is inscribed on a tangible medium or that is stored

Burns argues that the Agreement, when read as a whole, constitutes the consent of Mr. Burns to be the parent of any child resulting from the use of his preserved semen following his death. The SSA argues that the Agreement is insufficient to constitute consent to be a parent. We agree with the SSA.

¶ 10 Mrs. Burns next contends that if the Agreement is vague or ambiguous, we should look to extrinsic evidence of consent. We conclude that the Agreement was not vague or ambiguous regarding consent to be a parent.

I. AN AGREEMENT LEAVING PRESERVED FROZEN SEMEN TO THE DECEASED DONOR'S SPOUSE DOES NOT CONSTITUTE SUFFICIENT CONSENT IN A RECORD TO BE THE PARENT OF A CHILD CONCEIVED FOLLOWING THE DONOR'S DEATH

¶ 11 To determine the meaning of "consented ... [to] be a parent" as used in the Utah Uniform Parentage Act, we begin with the plain language of the statute. When interpreting Utah statutes, "this court's objective is to give effect to the legislature's intent. To discern legislative intent, we look first to the statute's plain language. If the language of the statute yields a plain meaning that does not lead to an absurd result, the analysis ends." [5] Additionally, we "read each term according to its ordinary and ac-

cepted meaning," [6] while "giv[ing] effect to every provision of a statute and avoid[ing] an interpretation that will render portions of a statute inoperative." [7]

¶ 12 The Utah Uniform Parentage Act does not define "consent," but *Black's Law Dictionary* defines it as, "[a]greement, approval, or permission as to some act or purpose, esp[ecially] given voluntarily by a competent person; legally effective assent." [8] The Utah Uniform Parentage Act defines "parent," but the definition is circular and difficult to apply when an individual dies before the conception of the child. Utah Code section 78B–15–102(17) defines "parent" as "an individual who has established a parent-child relationship under Section 78B–15–201." [9] Utah Code section 78B–15–201(2)(e) requires that a father, in order to establish a father-child relationship, "consent[ ] to assisted reproduction ... under Part 7." [10] Returning to Part 7, the statute requires a deceased spouse to consent to "be a parent of the child." [11] Utah Code section 78B–15–707 begins by specifying that absent consent, "the deceased spouse is not a parent," [12] however, and the Semen Storage Agreement must therefore overcome that initial presumption.

¶ 13 Central to our analysis is the fact that the Semen Storage Agreement creates rights and obligations among the donor, the donor's spouse, and the storage entity (University of Utah). The purpose of the Agreement has

in an electronic or other medium and is retrievable in perceivable form."

**5.** *Carranza v. United States*, 2011 UT 80, ¶ 8, 267 P.3d 912 (citations omitted) (internal quotation marks omitted).

**6.** *Lopez v. United Auto. Ins. Co.*, 2012 UT 10, ¶ 10, 274 P.3d 897 (internal quotation marks omitted).

**7.** *Warne v. Warne*, 2012 UT 13, ¶ 36, 275 P.3d 238.

**8.** Black's Law Dictionary 346 (9th ed.2009).

**9.** Utah Code section 75–1–201(33) defines "parent" for purposes of probate. However, that definition is similarly unhelpful. A parent is "any person entitled to take, or who would be entitled to take if the child died without a will, as a parent under this code by intestate succession

from the child whose relationship is in question and excludes any person who is only a stepparent, foster parent, or grandparent." The code section presumes a living parent and a deceased child.

**10.** Utah Code section 78B–15–201(2) includes six alternatives to establish a father-child relationship. Utah Code section 78B–15–201(2)(c) creates a father-child relationship if there is "an adjudication of a man's paternity." Although we express no opinion as to the validity or impact of the adjudication of Mr. Burns's paternity, we note that both the SSA and the Utah Attorney General's Office appear to have received notification of the parental adjudication process and hearings.

**11.** Utah Code § 78B–15–707.

**12.** *Id.*

nothing whatsoever to do with one's status as a parent, and the text of the Agreement bears on the topic of "parent" only obliquely. None of Mrs. Burns's attempts to extract the notion of parent from its terms are availing.

¶ 14 Subsection 3I allows the donor to dictate what he would like done with his stored samples upon his death. There are two options under the subsection, each requiring the donor's initials to indicate his choice as to the disposition of his samples. Mr. Burns indicated that he wished his stored samples to be donated to his wife upon his death. The subsection reads, "In the event of the death of the donor the donor would like his vials of semen ... [m]aintained in storage for future donation to Gayle Burns ... who will assume all of the obligations and terms described in this contract." Mrs. Burns argues that Mr. Burns's choice in this subsection constitutes his consent to be a parent.

¶ 15 Mrs. Burns also points to the numerous references to pregnancy, future pregnancy, and artificial insemination in the Agreement to demonstrate that subsection 3I constitutes Mr. Burns's consent to be a parent of a child conceived after his death. The Agreement does indeed make references to pregnancy or future pregnancy, but all of the references to pregnancy or other elements of reproduction relate to topics other than parenting. Section 1 of the Agreement states, "[s]emen is desired by the donor for one or more of the following reasons." The Agreement then lists eight possible choices, including, "[p]rior to irradiation and/or chemotherapy," and "[p]rior to artificial insemination." The Agreement did not require Mr. Burns to indicate his reason for depositing semen. Mrs. Burns concedes, however, that Mr. Burns chose to indicate "[p]rior to irradiation and/or chemotherapy" without indicating "[p]rior to artificial insemination" on the Agreement.

■ ¶ 16 Mrs. Burns points to subsection 3A, which reads, "I understand that it is impossible to determine with absolute certainty if my semen will freeze and thaw well enough to contribute to a future pregnancy." But the subsection, when read in its entirety, is an agreement to have a semen analysis,

with the results to be sent to the donor and the donor's physician to determine viability and justify preserving a sample. The subsection then goes on to state that if the process is "unlikely to result in live sperm upon future thawing, the donor will be discouraged from cryopreserving sperm." Subsection 3A is not an indication of consent to be a parent. Rather, it states the process for the evaluation of semen samples prior to preservation.

■ ¶ 17 Mrs. Burns also relies on subsection 3B. Mrs. Burns points to the language, "[i]t is currently estimated that fresh sperm results in a three fold [sic] higher chance of pregnancy compared to frozen-thawed sperm. Storage of 12–15 vials should result in 4–6 months of trying to achieve pregnancy with insemination." Mrs. Burns notes the subsection concludes by stating, "[t]he more vials that are stored the higher the chance that the semen will be able to eventually result in a pregnancy if all conditions are ideal." However, when construing the subsection as a whole as it pertains to the Agreement, the subsection's purpose is to suggest the amount of semen that the party should place in long-term storage. Specifically, the subsection also reads, "[i]t is suggested that at least 12–15 vials be frozen for long term storage." Thus, this subsection relays to the donor a suggested amount of semen to be stored should the couple later elect to pursue insemination. Subsection 3 makes no express declaration of consent to be a parent of a child conceived through the use of cryopreserved semen.

■ ¶ 18 Mrs. Burns then argues that subsection 3M of the Agreement, when read with the rest of the document, can be construed to constitute Mr. Burns's consent. Particularly, she points to the phrase, "the offspring resulting from the artificial insemination utilizing said semen samples and/or procedures connected therewith." Mrs. Burns lifts this language from its context. Subsection 3M releases the University of Utah from any liability relating to the collection, storage, preservation, evaluation, or transfer of the semen samples. Additionally, subsection 3M refers to subsection 3L, which

is a liquidated damages clause, allowing the donor to recover $100 in the event the stored semen is lost, damaged, or destroyed. Again, although there is reference to the possibility of future pregnancy, we cannot find any construction of the subsection that constitutes Mr. Burns's consent to be a parent.

■■■ ¶ 19 Mrs. Burns's arguments concerning the Agreement fail because something more is required to constitute consent to be a parent of a posthumously conceived child. The purpose of the Agreement is stated in the first sentence: "to act as an agreement to store semen for the purpose of short and/or long term storage in liquid nitrogen." Although the Agreement listed and clearly contemplated artificial insemination as a potential reason for storing the samples, Mr. Burns chose to circle "[p]rior to ... chemotherapy" without circling "[p]rior to artificial insemination." Additionally, although the Agreement is based on the premise that the purpose of storing semen is to create children, the contract is dedicated to the legal obligations regarding storage, not use. Subsection 3C explains the duration of frozen semen storage (six months) and creates an automatic renewal process provided the other terms of the contract are met. Subsections 3D, 3E, and 3F outline the fee schedule for the semen freezing, storage, and thawing. Subsection 3G describes the process under which the University will release the samples to the donor or another authorized agent. The other terms describe the risks associated with collecting, freezing, thawing, and storing semen; the duties of the parties to keep each other aware of changes in contact information; the termination of the Agreement; and the duties of the parties upon the termination of the Agreement.

¶ 20 We agree with the SSA in that "the mere act of preserving semen does not show an individual's intent to be a parent." The act prevents the foreclosure of genetic offspring following an event that renders the man sterile. The Agreement was between Mr. Burns and the University for the purpose of storing his semen. The Agreement specifically outlined the risks and obligations of the contracting parties. It also provided for the transfer of those obligations upon Mr. Burns's death. It did not ask for Mr. Burns's consent to be a parent of a posthumously conceived child.

¶ 21 We conclude that, without more, a Semen Storage Agreement that leaves frozen preserved sperm to the donor's wife upon his death does not constitute sufficient consent in a record to be the parent of a child conceived by artificial means following the donor's death.

## II. WE DECLINE TO CONSIDER EXTRINSIC EVIDENCE BECAUSE THE AGREEMENT IS NOT AMBIGUOUS

■■■ ¶ 22 Mrs. Burns argues that if the Agreement is vague or ambiguous, we should look to extrinsic evidence to determine whether Mr. Burns consented to be the parent of a child born using his cryopreserved semen. The SSA argues that this court should not look to extrinsic evidence because it falls outside the scope of the certified question, the Agreement is not ambiguous, and the question is one of statutory rather than contract interpretation. Alternatively, the SSA argues that even if contract interpretation is at issue, the Agreement contains an integration clause that precludes us from considering extrinsic evidence.

¶ 23 For the reasons stated in Part I, we find that the contract is not ambiguous in its terms. We decline to look to extrinsic evidence in interpreting the Agreement.[13] Although the Agreement includes references to pregnancy, there is no ambiguity as to whether the contract contained a clause in which Mr. Burns consented to be a parent. It is simply not contemplated in the terms of the Agreement. The Agreement is a contract between Mr. Burns and the University of Utah with the stated purpose of "act[ing] as an agreement to store semen for the purpose of short and/or long term storage in

---

**13.** *See Allen v. Prudential Prop. & Cas. Ins. Co.,* 839 P.2d 798, 807 (Utah 1992) (declining to consider an argument based on the reasonable expectations doctrine because "the disputed exclusion is not ambiguous").

liquid nitrogen." The Agreement outlines Mr. Burns's rights and obligations associated with the Agreement, which are: (1) an understanding of the semen analysis and storage process; (2) the suggested amount of semen to be stored; (3) the duration of storage; (4) the fees associated with semen storage, freezing, and thawing; (5) the payment, due date, and failure to pay fees associated with semen storage; (6) the understanding that the freezing of samples may render it ineffective for later use, and that Mr. Burns assumes that risk; (7) a clause indemnifying the University of Utah from adverse outcomes; (8) a liquidated damages clause in the event the semen is destroyed, lost, or stolen; (9) the termination of the Agreement; and (10) the disposition of the samples and contractual obligations should the donor die. The Agreement does not contain an ambiguous clause regarding Mr. Burns's consent to be a parent to a child born after his death.

## CONCLUSION

¶ 24 Under Utah Code section 78B–15–707, the signed agreement to donate preserved sperm to Mr. Burns's wife in the event of his death is not sufficient to constitute consent in a record to be the parent of a child conceived by artificial means after the donor's death. The Agreement in question makes no mention of the donor's consent to be a parent of a child using his preserved semen. The Agreement is a contract that defines the risks and obligations between Mr. Burns and the University of Utah.

Associate Chief Justice NEHRING authored the opinion of the Court, in which Chief Justice DURRANT, Justice DURHAM, Justice PARRISH, and Justice LEE joined.